**CENTEX HOMES and Centex Real Estate Corporation d/b/a Centex Homes, Petitioners,**

v.

**Michael A. BUECHER, et al., Respondents.**

**No. 00–0479.**

Supreme Court of Texas.

Argued Nov. 29, 2001.

Decided Dec. 31, 2002.

Rehearing Denied Feb. 20, 2003.

Joe R. Greenhill, Austin, Samara L. Kline, Dallas, Bob E. Shannon, Joseph R. Knight, Austin, Baker & Botts, Warren W.

Harris, Houston, Annalyn G. Smith, San Antonio and Eugene A. Cook, Houston, Bracewell & Patterson, and Ernest R. Higginbotham, Dallas, Strasburger & Price, for Petitioners.

Bryan A. Woods, Law Office of Bryan A. Woods, San Antonio, and Joe K. Longley, Longley & Maxwell, Austin, Barry Snell, Bayne Snell & Krause, San Antonio, for Respondents.

Chief Justice PHILLIPS delivered the opinion of the Court,[1] in which Justice HANKINSON, Justice O'NEILL, Justice JEFFERSON, and Justice SMITH joined.

We deny Centex Homes' motion for rehearing. We withdraw our opinion of August 29, 2002, and substitute the following in its place.

The issue in this case is whether a homebuilder may disclaim the implied warranties of habitability and good and workmanlike construction that accompany a new home sale. The sales contract here provided that the builder's express limited warranty replaced all other warranties, including these two implied warranties. Holding that the implied warranties of habitability and good and workmanlike construction could not be waived, the court of appeals reversed the trial court's judgment and remanded the homeowners' claims for further proceedings. 18 S.W.3d 807.

We agree with the court of appeals that the implied warranty of habitability cannot be waived except under limited circumstances not implicated here. We disagree, however, that the implied warranty of good and workmanlike construction cannot be disclaimed. When the parties' agreement sufficiently describes the manner, performance or quality of construction, the express agreement may supersede the implied warranty of good workmanship. Although we do not agree in all respects with the court of appeals' reasoning, we affirm its judgment remanding this cause to the trial court.

I

Michael Buecher and other homeowners purchased new homes built by Centex Homes or Centex Real Estate Corporation doing business as Centex Homes. Each homeowner signed a standard form sales agreement prepared by Centex. The homeowners allege that the agreement contained a one-year limited express warranty in lieu of and waiving the implied warranties of habitability and good and workmanlike construction. Specifically, the disclaimer provision provided:

At closing Seller will deliver to Purchaser, Seller's standard form of homeowner's Limited Home Warranty against defects in workmanship and materials, a copy of which is available to Purchaser. PURCHASER AGREES TO ACCEPT SAID HOMEOWNER'S WARRANTY AT CLOSING IN LIEU OF ALL OTHER WARRANTIES, WHATSOEVER, WHETHER EXPRESSED OR IMPLIED BY LAW, AND INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF GOOD WORKMANLIKE CONSTRUCTION AND HABITABILITY. PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER IS RELYING ON THIS WAIVER AND WOULD NOT SELL THE PROPERTY TO PURCHASER WITHOUT THIS WAIVER. Purchaser's ini-

---

1. JUSTICE BAKER and JUSTICE RODRIGUEZ joined in the Court's original opinion but have since resigned from the Court.

tials in the margin indicate their approval of this section 8.

(Emphasis in original.)

After Buecher and the other plaintiffs purchased their homes, they sued Centex alleging fraud, misrepresentation, negligence, and violation of the of the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA") in connection with the construction and sale of their new homes. The homeowners also sought to certify a class action against Centex, seeking (1) an injunction to prevent Centex from asserting that the implied warranties of habitability and good and workmanlike construction had been waived by the provisions in its sales contracts; (2) an injunction prohibiting Centex from asserting to any homeowner or subsequent purchaser that it had no liability for construction defects beyond the period set forth in the express warranty it gave in lieu of implied warranties; (3) a declaration that the disclaimer provision is unenforceable as a matter of law; and (4) notification to all purchasers and subsequent purchasers within the putative class that Centex's waiver of implied warranties is void and unenforceable.

Centex filed a special exception and motion to dismiss the proposed class action. Relying on *G–W–L, Inc. v. Robichaux*, 643 S.W.2d 392 (Tex.1982), it argued that a purchaser of a new home can waive the implied warranties of good and workmanlike construction and habitability if the language waiving those warranties is clear and free from doubt. Centex asserted that the waiver at issue in this case was clear and free from doubt. Centex also argued that its waiver provision did not violate the DTPA's anti-waiver provision because the DTPA does not create any implied warranty of good and workmanlike construction or habitability, but only provides an additional remedy for breach of implied warranties.

The homeowners announced in open court that they could not amend their petition to meet Centex's special exception. The trial court (1) granted the special exception; (2) struck all the class action allegations based on the contention that the disclaimer provision is illegal, void, or unenforceable; (3) severed those claims from the homeowners' individual claims; and (4) dismissed the proposed class action. The homeowners appealed. A divided court of appeals, sitting en banc, reversed the trial court's judgment and remanded the cause for further proceedings. 18 S.W.3d 807, 811. The court of appeals held that a homebuilder may not disclaim or cause a homeowner to waive the implied warranties of habitability and good and workmanlike construction. *Id.* at 808.

## II

In *Humber v. Morton*, 426 S.W.2d 554, 555 (Tex.1968), this Court recognized that a builder of a new home impliedly warrants that the residence is constructed in a good and workmanlike manner and is suitable for human habitation. In replacing caveat emptor with these two implied warranties, we noted the significance of a new home purchase for most buyers and the difficulty of discovering or guarding against latent defects in construction:

> The old rule of caveat emptor does not satisfy the demands of justice in [the sale of new homes]. The purchase of a home is not an everyday transaction for the average family, and in many instances is the most important transaction of a lifetime. To apply the rule of caveat emptor to an inexperienced buyer, and in favor of a builder who is daily engaged in the business of building and selling houses, is manifestly a denial of justice.

*Humber,* 426 S.W.2d at 561 (quoting *Beth-lahmy v. Bechtel,* 91 Idaho 55, 415 P.2d 698 (1966)). Subsequently, in *G–W–L, Inc. v. Robichaux,* we conflated the *Humber* warranties of good workmanship and habitability, concluding that the "Humber warranty" could be disclaimed or waived if that intent were clearly expressed in the parties' agreement. *Robichaux,* 643 S.W.2d at 393. Centex therefore argues that the court of appeals' holding that the implied warranties of good and workmanlike construction and habitability cannot be waived conflicts with *Robichaux.*

The homeowners respond that *Robichaux* is no longer the law in Texas because it was overruled in *Melody Home Manufacturing Co. v. Barnes,* 741 S.W.2d 349, 355 (Tex.1987). *Melody Home* recognized for the first time an implied warranty of good workmanship in the repair or modification of tangible goods or property. *Id.* at 354. The Court further announced as a matter of public policy that this implied warranty for repair services could not be waived or disclaimed. *Id.* at 355. Referencing the dissent in *Robichaux,* the Court noted the incongruity of requiring the creation of an implied warranty and yet permitting its elimination "by a pre-printed standard form disclaimer or an unintelligible merger clause." *Id.* The Court suggested that such disclaimers should not be allowed because they encouraged shoddy workmanship, thus circumventing the consumer's reasonable expectations that the job would be performed with reasonable skill. *Id.* At the end of this discussion, the Court purported to overrule *Robichaux* "[t]o the extent that it conflicts with this opinion." *Id.* The meaning and scope of this statement have proven elusive because it is unclear to what extent *Robichaux* and *Melody Home* actually conflict.

Factually, the two cases do not conflict at all. *Melody Home* does not apply the *Humber* warranties at issue in *Robichaux.* But the implied warranty of good and workmanlike construction in *Humber* and the implied warranty of good and workmanlike repair services in *Melody Home* are very similar, and yet the two cases diverge drastically on appropriate public policy in this area. *Melody Home* rejects *Robichaux's* notion that the implied warranty of good workmanship may freely be disclaimed as long as that intention is clearly expressed. *Id.* Because the two cases are factually distinguishable, yet legally antithetical, other authorities have had trouble determining how much of *Robichaux* survives *Melody Home.*

Some have concluded that after *Melody Home* the *Humber* warranties could no longer be waived or disclaimed. *See Haney v. Purcell Co.,* 796 S.W.2d 782, 786 n. 3 (Tex.App.-Houston [1st Dist.] 1990, writ denied) (*Melody Home* overruled *Robichaux* "with regard to the issue of waiver of warranty"); 18 WILLIAM DORSANEO III, TEXAS LITIGATION GUIDE § 270.121[1][b], at 270–113 (2002) (*Humber* warranties may not be waived or disclaimed, citing *Melody Home* ); 20 HERBERT S. KENDRICK AND JOHN J. KENDRICK, JR., TEXAS TRANSACTION GUIDE § 83A:21[3] at 83A–18 (2002) (same). But because *Melody Home* and *Robichaux* involve different implied warranties, an argument can be made that the two opinions do not actually conflict, and thus *Robichaux's* waiver of the *Humber* warranties survives. Because *Melody Home* has cast doubt on the validity of *Robichaux's* waiver holding, we re-examine our holding in that case.

### III

In *Robichaux,* the alleged defect in the buyers' new home was a sagging roof. The trial court rendered judgment for the

buyers on jury findings that the builder "had failed to construct the roof in a good workmanlike manner and that the house was not merchantable at the time of completion." *Robichaux*, 643 S.W.2d at 392. The court of appeals affirmed.

We disagreed and rendered judgment for the builder. *Id.* We held that the implied "warranty of merchantability" was a sales warranty under the Texas Uniform Commercial Code, which did not apply to the sale of a house. *Id.* at 394. Then, in reviewing the jury finding that the roof was not constructed in a good and workmanlike manner, the Court conflated the *Humber* warranties of good workmanship and habitability, referring to the warranty at issue as both the "implied warranty of fitness" and the "implied warranty of habitability." *Id.* at 393. In fact, the implied warranty of habitability was not at issue in the case because the jury had only found a breach of the implied warranty of good and workmanlike performance. *See id.* at 392. The Court nevertheless concluded that language in the sales documents that there were no "warranties, express or implied, in addition to said written instruments" was sufficiently clear to effectively disclaim the implied warranty of habitability. *Id.* at 393.

### A

Centex argues that we should adhere to *Robichaux* because it is consistent with decisions from other states allowing parties to expressly disclaim the implied warranties that ordinarily arise with new home sales. *See, e.g. Greeves v. Rosenbaum*, 965 P.2d 669, 673 (Wyo.1998); *O'Mara v. Dykema*, 328 Ark. 310, 942 S.W.2d 854, 859 (1997); *Frickel v. Sunnyside Enters., Inc.*, 106 Wash.2d 714, 725 P.2d 422, 426 (1986) (en banc); *Dixon v. Mountain City Constr. Co.*, 632 S.W.2d 538, 542 (Tenn.1982); *Petersen v. Hub-*

*schman Constr. Co.*, 76 Ill.2d 31, 27 Ill. Dec. 746, 389 N.E.2d 1154, 1159 (1979); *Griffin v. Wheeler–Leonard & Co.*, 290 N.C. 185, 225 S.E.2d 557, 567 (1976); *Casavant v. Campopiano*, 114 R.I. 24, 327 A.2d 831, 833 (1974). These cases, however, generally fail to differentiate between the implied warranty of good workmanship and the implied warranty of habitability. For example, the Supreme Courts of Tennessee and North Carolina hold that the implied warranty of good workmanship can be disclaimed, but never mention the implied warranty of habitability. *Dixon* 632 S.W.2d at 541; *Griffin*, 225 S.E.2d at 566.

The Supreme Court of Arkansas mentions habitability as an implied warranty that may be waived, but includes it as part of its good workmanship warranty. *See O'Mara*, 942 S.W.2d at 859 (implied warranty of "habitability, sound workmanship, and proper construction" can be waived). The Arkansas court apparently recognizes an alternative tort remedy for the sale of a unsafe house. *Id.* at 858 (suggesting strict products liability may apply if house is "in a defective condition unreasonably dangerous"). Illinois and Rhode Island also do not view the implied warranties as separate. *See Petersen*, 76 Ill.2d 31, 27 Ill.Dec. 746, 389 N.E.2d at 1158–59; *Casavant*, 327 A.2d at 833–34. The Illinois Supreme Court, for example, observes that the implied warranty of habitability is unfortunately named because it does not mean that the house is literally uninhabitable. *Petersen*, 76 Ill.2d 31, 27 Ill.Dec. 746, 389 N.E.2d at 1158. In contrast, we have defined a breach of this implied warranty in Texas to be a defect "of a nature which will render the premises unsafe, or unsanitary, or otherwise unfit for living therein." *Kamarath v. Bennett*, 568 S.W.2d 658, 661 (Tex.1978).

Another case cited by Centex, *Frickel v. Sunnyside Enters., Inc.*, 106 Wash.2d 714, 725 P.2d 422 (1986). (en banc), involved the sale of an apartment complex rather than a new home. The Washington Supreme Court held that the implied warranty of habitability could be disclaimed in this type of sale. The dissent noted, however, that the warranty of habitability was not really at issue in *Frickel*, because the claim was merely that the apartments were poorly constructed. *Id.* at 432 (Pearson, C.J., dissenting). The dissent further observed that a disclaimer of the warranty of habitability in the context of a new home sale would contravene public policy:

> As yet, Washington courts have not determined the validity of disclaimers of the implied warranty of habitability. In the landlord-tenant area, this court held that such disclaimers contravene public policy. *Foisy v. Wyman*, 83 Wash.2d 22, 28, 515 P.2d 160 (1973). Arguably, the result should be the same in the new house context.

*Id.* at 434 (Pearson, C.J., dissenting).

*Greeves v. Rosenbaum*, 965 P.2d 669 (Wyo.1998), on the other hand, does involve a new home sale and does mention the implied warranty of habitability, but does not directly support Centex's position. There, the buyer signed a contract for deed on a new home. The buyer knew at the time that "the property was currently the subject of ongoing litigation." *Id.* at 671. A visual inspection of the property during that litigation revealed potential problems with the lumber used for the floor joists. "The Greeves then hired their own inspector, who concurred with the results of the first inspection." *Id.* The Greeves nevertheless closed on the property, acknowledging that they had inspected the property and were taking it "as is" except for a one year express warranty. They later sued under the express warran-

ty and also alleged breach of the implied warranty of habitability. The Wyoming Supreme Court rejected the implied warranty claim, relying in part on a state statute providing that an "as is" sale eliminates all implied warranties "[U]nless the circumstances indicate otherwise." *Id.* at 673 (quoting Wyo. Stat. § 34–21–233(c) (1977)). The court further observed that this was "not a case where the builder-vendor attempted to hide a latent defect or dissuade the buyer from inspecting the premises; the [buyers] had an unobstructed opportunity to protect their investment through the engagement of a professional to conduct a visual inspection." *Id.* at 674. Although the buyers denominated their implied warranty claim as one involving habitability, it was in fact a claim for breach of the implied warranty of good workmanship.

All of these cases either ignore the implied warranty of habitability or treat it as part of the implied warranty of good workmanship. In Texas, however, the two warranties provide separate and distinct protection for the new home buyer. *See Evans v. J. Stiles, Inc.*, 689 S.W.2d 399, 400 (Tex.1985) (possible to breach warranty of good workmanship without breaching warranty of habitability); *accord Chandler v. Madsen*, 197 Mont. 234, 642 P.2d 1028, 1031 (1982) (distinguishing between the two implied warranties). Unfortunately, as in *Robichaux*, we have not always been careful to distinguish between the two. *See Robichaux*, 643 S.W.2d at 393. But because they are distinct and different warranties, it is important to consider the particular purpose of each when considering issues of waiver or disclaimer.

### B

The implied warranty of good workmanship focuses on the builder's conduct, while the implied warranty of habita-

bility focuses on the state of the completed structure. *See* Clarkson, Note, *Implied Warranties of Quality in Texas Home Sales: How Many Promises to Keep?*, 24 Hous. L.Rev. 605, 617–18 (1987). Through the implied warranty of good workmanship, the common law recognizes that a new home builder should perform with at least a minimal standard of care. *See* Jones, *Economic Losses Caused by Construction Deficiencies: The Competing Regimes of Contract and Tort*, 59 U. Cin. L.Rev. 1051, 1059–60 (1991); Block, *As the Walls Came Tumbling Down: Architects' Expanded Liability Under Design–Build/Construction Contracting*, 17 J. Marshall L.Rev. 1, 18 n. 86 (1984); Greenfield, *Consumer Protection in Service Transactions—Implied Warranties and Strict Liability in Tort*, 1974 Utah L.Rev. 661, 666. This implied warranty requires the builder to construct the home in the same manner as would a generally proficient builder engaged in similar work and performing under similar circumstances. *See Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 354–55 (Tex.1987). The implied warranty of good workmanship serves as a "gap-filler" or "default warranty"; it applies unless and until the parties express a contrary intention. *See* Davis, *The Illusive Warranty of Workmanlike Performance: Constructing a Conceptual Framework*, 72 Neb. L.Rev. 981, 999–1009 (1993) (historical and intended purpose of good workmanship warranty was to serve as a gap-filler). Thus, the implied warranty of good workmanship attaches to a new home sale if the parties' agreement does not provide how the builder or the structure is to perform.

▮ The implied warranty of habitability, on the other hand, looks only to the finished product:

> [T]he implied warranty of habitability is a result oriented concept based upon

specific public policy considerations. These include the propriety of shifting the costs of defective construction from consumers to builders who are presumed better able to absorb such costs; the nature of the transaction which involves the purchase of a manufactured product, a house; the buyer's inferior bargaining position; the foreseeable risk of harm resulting from defects to consumers; consumer difficulty in ascertaining defective conditions; and justifiable reliance by consumers on a builder's expertise and implied representations.

Davis, 72 Neb. L.Rev. at 1019 (footnotes omitted). This implied warranty is more limited in scope, protecting the purchaser only from those defects that undermine the very basis of the bargain. *Id.* at 1015. It requires the builder to provide a house that is safe, sanitary, and otherwise fit for human habitation. *Kamarath*, 568 S.W.2d at 660. In other words, this implied warranty only protects new home buyers from conditions that are so defective that the property is unsuitable for its intended use as a home. As compared to the warranty of good workmanship, "the warranty of habitability represents a form of strict liability since the adequacy of the completed structure and not the manner of performance by the builder governs liability." Davis, 72 Neb. L.Rev. at 1015 (1993) (footnotes omitted).

These two implied warranties parallel one another, and they may overlap. For example, a builder's inferior workmanship could compromise the structure and cause the home to be unsafe. But a builder's failure to perform good workmanship is actionable even when the outcome does not impair habitability. *Evans*, 689 S.W.2d at 400. Similarly, a home could be well constructed and yet unfit for human habitation if, for example, a builder construct-

ed a home with good workmanship but on a toxic waste site. Unfortunately, many courts, including this one, have not consistently recognized these distinctions.

### C

In *Robichaux*, we failed to distinguish between habitability and good workmanship, conflating the two implied warranties and concluding that they could be disclaimed with clear language. *Robichaux*, 643 S.W.2d at 393. And although habitability was not at issue, we indiscriminately swept it into our analysis. That analysis further omitted any discussion of the public policy considerations that prompted the creation of the *Humber* warranties in the first place. *See Humber*, 426 S.W.2d at 561 (rejecting rule of caveat emptor in new home sales); *see also* 17 RICHARD A. LORD, WILLISTON ON CONTRACTS § 50:30(4th ed.2000) (noting that the modern trend rejects rule of caveat emptor in new home sales).

We created the *Humber* implied warranties to protect the average home buyer who lacks the ability and expertise to discover defects in a new house. *Humber*, 426 S.W.2d at 561. Such buyer generally expects to receive a house that is structurally sound, habitable and free of hidden defects, and these implied warranties serve to protect the buyer's reasonable expectations. While the parties are free to define for themselves the quality of workmanship, there is generally no substitute for habitability. The implied warranty of habitability is thus an essential part of a new home sale.

■ The Supreme Court of Missouri has stated that while it does not "reject outright the possibility of a valid disclaimer or modification [of the implied warranty of habitability] under any set of facts," a valid waiver requires more than clear and unambiguous language. *Crowder v. Van-*

*dendeale*, 564 S.W.2d 879, 881 (Mo.1978) (en banc). Under *Crowder*, the builder is required to prove that the buyer actually understood what he or she was waiving:

> [O]ne seeking the benefit of such a disclaimer must not only show a conspicuous provision which fully discloses the consequences of its inclusion but also that such was *in fact* the agreement reached. The heavy burden thus placed upon the builder is completely justified, for by his assertion of the disclaimer he is seeking to show that the buyer has relinquished protection afforded him by public policy. A knowing waiver of this protection will not be readily implied."

*Id.* at 881 n. 4. We agree with the Missouri Supreme Court that the warranty of habitability can be waived only to the extent that defects are adequately disclosed. Thus only in unique circumstances, such as when a purchaser buys a problem house with express and full knowledge of the defects that affect its habitability, should a waiver of this warranty be recognized.

■ The implied warranty of good workmanship, however, defines the level of performance expected when the parties fail to make express provision in their contract. It functions as a gap-filler whose purpose is to supply terms that are omitted from but necessary to the contract's performance. *See* RESTATEMENT (SECOND) CONTRACTS § 204 (1981)(*Supplying an Omitted Essential Term*). As a gap-filler, the parties' agreement may supersede the implied standard for workmanship, but the agreement cannot simply disclaim it. *See generally Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 570 (Tex.1996) (interpreting UCC gap-filler).

### IV

■ In conclusion, we hold that the implied warranty of good workmanship

may be disclaimed by the parties when their agreement provides for the manner, performance or quality of the desired construction. We further hold that the warranty of habitability may not be disclaimed generally. This latter implied warranty, however, only extends to defects that render the property so defective that it is unsuitable for its intended use as a home. Further, the implied warranty of habitability extends only to latent defects. It does not include defects, even substantial ones, that are known by or expressly disclosed to the buyer.

In the trial court, the homeowners, who had purchased homes from Centex under standardized contracts disclaiming the implied warranty of habitability and the implied warranty of good and workmanlike construction, sought a judicial declaration as a class that the disclaimer was unenforceable. The trial court concluded that the disclaimer provision validly waived both implied warranties and dismissed the class claims. Without deciding whether a class action is appropriate in this case, we remand the class claims for consideration in light of our clarification of the purpose and protection afforded by these implied warranties.

The court of appeals' judgment is affirmed.

Justice HECHT filed a dissenting opinion.

Justice OWEN filed a dissenting opinion.

1. 45 Tex. Sup.Ct. J. 1216, 1216 (Aug. 29, 2002).

2. *Id.* at 1221.

3. *Id.*

4. *Ante* at 1224 (Hecht, J., dissenting).

Justice ENOCH notes his dissent.

Justice SCHNEIDER did not participate.

Justice HECHT, dissenting from the denial of the motion for rehearing.

Here, now, is an example for appellate lawyers of the perils of moving for rehearing: it is unlikely when you do that things will get much better, and they can certainly get worse.

In its first opinion, the Court stated that the agreements between the homeowners and Centex "contained a one-year limited express warranty in lieu of and waiving the implied warranties of habitability and good and workmanlike construction." [1] The Court held that (1) "the implied warranty of habitability may not be disclaimed generally" *but* "only extends to defects that render the property unsuitable for its intended use for a home because it endangers the life, health or safety of the resident," [2] and (2) "the implied warranty of good workmanship may be disclaimed by the parties when their agreement provides for sufficient detail on the manner and quality of the desired construction." [3] The Court's opinion did not discuss Centex's argument that any limitations on the disclaimers of these implied warranties should apply prospectively only. [4]

Centex moved for rehearing, supported by twenty-three amici curiae representing virtually the entire Texas home building industry, which counts among its ranks thousands of small businesses as well as four of the five biggest home builders in America. [5] Centex and the amici argue

5. Amici are Home Builders Association of Greater Dallas; Greater Fort Worth Builders Association; Greater Houston Builders Association; Greater San Antonio Builders Association; Texas Capitol Area Builders Association; Texas Association of Builders, Inc.; Lennar Homes; U.S. Home; Village Builders; NuHome Design; KBHome; D.R. Horton,

that the Court has misunderstood their industry—no doubt, they say, because of the spare factual record in this case—and that its decision is likely to cause unintended harm. They urge four things: (1) that the Court respond to their argument that its decision should not apply retroactively; (2) that the Court clarify whether the express warranty of workmanship most common in the industry can displace the implied warranty; (3) that the Court reconsider its general prohibition of disclaimers of the implied warranty of habitability; and (4) that the Court correct its factual misstatement that the express warranty Centex provided was for only one year. Since most courts are ordinarily disinclined to reconsider their decisions, one would not expect (3) to have much chance of success. But one might reasonably expect that: as to (1), out of respect for the parties to a case, the Court would at least *mention* all of the dispositive arguments; as to (2), out of respect for an industry and its consumers, the Court would make the law as clear as possible; and as to (4), out of respect for itself, the Court would correct its own factual misstatements.

Here is the Court's ruling: re prospectivity, silence, meaning that Centex and the amici still do not deserve to have their argument addressed at all; re workmanship, a few words are changed in three sentences, and three parenthetical explanations of cited authorities are deleted (as if deleting the explanation deletes the authority), dispelling none of the confusion; re habitability, the scope of the implied warranty is changed at no one's request and without deliberation, generating new confusion; and re the factual error, it is corrected only in a begrudging way that remains misleading. Reading the arguments on rehearing and then the changes the Court has made in its opinion, one is given the distinct impression that the JUSTICES in today's majority share no fundamental agreement on what the law in this case is (or else they would explain themselves) and yet are determined to say what it is before the Court's membership changes again (tomorrow), resulting in an opinion that more resembles legislation than judicial decision-making: compromise cobbled together remotely responding to the parties' arguments but providing as little guidance as possible. Parties hoping for a reasoned decision so that they can order their affairs in accordance with the law and avoid litigation are ill-treated by the Court's opinion. For reasons that follow, I would grant the motion for rehearing.

## I

Centex and the amici argue that the Court should make its decision prospective only and should not void disclaimers of the implied warranties of good workmanship and habitability retroactively. In *Elbaor v. Smith,*[6] the Court refused to retroactively void hundreds of past Mary Carter agreements even though it was convinced that those agreements had all caused trials to be unfair. In the present case, the Court voids *hundreds of thousands* of agreements based on disclaimers of implied warranties without evidence of a single injustice, ever. A retroactive application of the decision in this case simply cannot be squared with *Elbaor.*

Inc.; Highland Homes, Ltd.; Huntington Homes, Ltd.; Beazer Homes Texas L.P.; Legacy Homes; Hammonds Homes; Perry Homes; The Ryland Group, Inc.; Sotherby Homes; Pulte Home of Texas, L.P.; Residential Warranty Corp.; and HOME of Texas.

6. 845 S.W.2d 240, 250 (Tex.1992).

As a rule, court decisions apply retrospectively,[7] but there are exceptions, which are determined by balancing the following three factors:

(1) whether the decision establishes a new principle of law by either overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) whether prospective or retroactive application of the particular rule will further or retard its operation through an examination of the history, purpose, and effect of the rule; and (3) whether retroactive application of the rule could produce substantial inequitable results.[8]

As for whether the decision in this case establishes a new principle: The invalidity of disclaimers of the implied warranties of good workmanship and habitability has been argued by commentators,[9] just as the invalidity of Mary Carter agreements has.[10] Unlike Mary Carter agreements, however, such disclaimers have been expressly permitted in other states[11] and were expressly approved by this Court in *G–W–L, Inc. v. Robichaux*.[12] Before *Elbaor*, this Court had never approved Mary

Carter agreements, and Justice Spears had argued that they were void.[13] The Court's decision in *Melody Home Manufacturing Co. v. Barnes*[14] may have, in the Court's words, "cast doubt" on *Robichaux*,[15] but *Melody Home* did not involve the same warranties and was, as the Court concedes, "factually distinguishable".[16] Even now, the Court only modifies *Robichaux* and does not overrule it. So even if *Melody Home* could be said to have foreshadowed the decision in this case fifteen years later, surely home builders were nevertheless justified in relying on the express language in *Robichaux*, which retains some vitality after the decision in this case, instead of the veiled hint in *Melody Home*. In *Elbaor*, the Court's decision to invalidate Mary Carter agreements, though one of first impression, was consistent with the law in Texas and other states; in the present case, the Court's decision to invalidate disclaimers of implied warranties is directly contrary to its own prior decision and the law in other states and is not supported by a single case anywhere in the country. The first factor weighed in favor of withholding retroactive effect to our decision in *Elbaor*,

**7.** *Id.* at 250 (citing *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 434 (Tex.1984)).

**8.** *Id.* (citing *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 518–519 (Tex.1992), and *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–107, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971)).

**9.** *Ante* at 270 (citing 18 William Dorsaneo III, Texas Litigation Guide § 270.121[1][b], at 270–113 (2002), and 20 Herbert S. Kendrick & John J. Kendrick, Jr., Texas Transaction Guide § 83A:21[3], at 83A–18 (2002)).

**10.** *Elbaor*, 845 S.W.2d at 250 ("commentators have routinely criticized the Mary Carter agreement").

**11.** *Ante* at 1223 n. 14 & 15 (Hecht, J., dissenting) (citing authorities).

**12.** 643 S.W.2d 392 (Tex.1982).

**13.** *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 8–12 (Tex.1986) (Spears, J., concurring); *see General Motors Corp. v. Simmons*, 558 S.W.2d 855, 858 (Tex.1977) ("There is no contention in this case that the settlement agreement was void."); *Bristol–Myers Co. v. Gonzales*, 561 S.W.2d 801, 804 (Tex.1978) (not addressing whether the Mary Carter agreement in the case was invalid).

**14.** 741 S.W.2d 349 (Tex.1987).

**15.** *Ante* at 270.

**16.** *Ante* at 270.

and it weighs even more heavily in favor of the same result in the present case.

As for furthering desired policies: In *Elbaor* we concluded that retroactively invalidating Mary Carter agreements would prevent unfair trials but that that consideration was outweighed by the other two factors.[17] In the present case, it is unclear what effect retroactively invalidating disclaimers of implied warranties will have. We have no evidence that the disclaimers have been operating unjustly, like the evidence regarding Mary Carter agreements in *Elbaor.* On the contrary, amici tell us that federal regulations have long required that FHA and VA home buyers be given specified warranty protections,[18] and that these protections have come to be an industry standard for other homes. The Court does not mention these federal regulations—indeed, before the motion for rehearing was filed it did not know they existed—or discuss their impact on implied warranties. Moreover, we are told that disclaimers of implied warranties are the consideration given for express warranties, so that an express warranty is tied to the waiver of an implied warranty. If that is so and the disclaimers are void, then consideration has failed, the express warranties cannot be enforced, and home buyers are left with an implied warranty of habitability that may or may not provide as much protection as the express warranty would have. Again, without a factual record the Court cannot know what will be the impact of giving its decision retroactive effect. In any event, this second factor certainly weighs no more in favor of retroactivity than it did in *Elbaor* and might even be to the contrary.

As for the likelihood of inequitable results: In *Elbaor* we were concerned that retroactively invalidating Mary Carter agreements would disrupt bargains and revive litigation.[19] Such agreements, although not rare, were certainly not routine. There may have been scores of them, even hundreds. In the present case, amici tell us that invalidating disclaimers of implied warranties of good workmanship and habitability will affect not just hundreds but *hundreds of thousands* of agreements between home builders and home buyers. Residential Warranty Corporation and HOME of Texas say they have about 429,000 warranties in force that were provided by builders to new home buyers in Texas. The same concerns we had in *Elbaor* are not only present in this case, they are multiplied by an order of magnitude.

To apply the decision in this case retroactively is to upset thousands of bargains reached over decades in reliance on express language in this Court's opinion in *Robichaux.* However disruptive this turns out to be, one can hardly expect it to be less so than retroactively voiding Mary Carter agreements would have been. Following *Elbaor,* the Court should give its decision prospective effect only.

## II

In holding that an implied warranty of habitability cannot generally be disclaimed, the Court stated in its first opinion that this implied warranty

requires the builder to provide a house that is safe, sanitary, and otherwise fit for human habitation. *In other words,* this implied warranty only protects new home buyers from conditions that are

17. *Elbaor,* 845 S.W.2d at 251.

18. 24 C.F.R. § 203.205 (2002).

19. *Elbaor,* 845 S.W.2d at 251.

dangerous, hazardous, or detrimental to their life, health or safety.[20]

The Court reiterated that this warranty "only extends to defects that render the property unsuitable for its intended use as a home because it endangers the life, health or safety of the resident." [21] On motion for rehearing, Centex and the amici argue that the Court should reconsider its prohibition of disclaimers of the warranty, and the plaintiffs respond that the Court's decision is correct. No one has asked that the warranty be redefined.

On its own, the Court now says that the warranty applies whenever a home is "so defective that it is unsuitable for its intended use as a home." [22] Now, "safe, sanitary, and otherwise fit for human habitation" are "other words" for "unsuitable for its intended use as a home." What does "unsuitable" mean? The dictionary definition is "inappropriate".[23] Does it mean a bad paint job? A crack in the wall? An unlevel floor? A leaky roof? Few people would actually want to live in a new home with such defects or find it "suitable". The Court seems to be thinking of a very limited warranty tied not to esthetics but to safety, sanitariness, and danger to life and health. But if so, how does "unsuitable" express that limitation when suitability as a standard for defining the implied warranty of fitness for a particular purpose under the UCC is a fairly broad concept.[24] How is this new standard different from "dangerous, hazardous, or detrimental to life, health, or safety"? Does it contemplate a broader warranty or a narrower one, or is no change intended at all?

The Court's lack of explanation for this change in its opinion will doubtless leave the industry and consumers more confused than ever. Even if the Court could define a very limited implied warranty, it could not prevent the assertion in virtually every case that the warranty has been breached. When this Court created a cause of action of intentional infliction of emotional distress in 1993, it defined the culpable conduct as being " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " [25] Since then, intentional infliction of emotional distress has been alleged in every context imaginable and considered in hundreds of reported cases. It takes no prophet to predict that the Court's new, undisclaimable, limited, implied warranty of habitability will be alleged in virtually every case involving defects in a residence. The Court thrusts this burden of endless litigation on an industry and its consumers with no evidence whatever that an implied warranty is necessary to protect homeowners against injustice, and with no authority from any American jurisdiction that has found disclaimers intolerable.

## III

The Court holds that an express warranty regarding workmanship can displace the implied warranty. As for what such an express warranty should cover, the Court

**20.** 45 Tex. Sup.Ct. J. 1216, 1220 (Aug. 29, 2002) (citation omitted) (emphasis added).

**21.** *Id.* at 1221.

**22.** *Ante* at 273, 275.

**23.** WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2512 (1981).

**24.** *See* TEX. BUS. & COM.CODE § 2.315.

**25.** *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993) (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. d (1965)).

in its first opinion simply *assumed* that it would ordinarily "describe[ ] the manner, quality and details of construction".[26] The Court had nothing to support its assumption, and Centex and the amici now tell us that express warranties typically guarantee a result, not the manner of construction: in other words, that the roof won't leak, not that the roof will be built of such-and-such wood with such-and-such nails, etc. Centex and amici have asked for clarification whether the type of express warranty of workmanship that is commonly given will also displace an implied warranty. The answer must surely be yes. The Court's basic rationale is that parties should be allowed to agree to a more specific express warranty of workmanship in lieu of a vaguer implied warranty. This rationale does not turn on whether the specificity of the express warranty is in the manner of construction rather than the result to be achieved.

The Court's response is not to acknowledge that express warranties like those described by Centex and the amici are common or that they even exist at all. Rather, the Court changes three sentences in its opinion to delete "detail" and "details" and add "performance",[27] and then deletes three parenthetical explanations of cited authorities. Presumably, eliminating the parenthetical's did not alter the authorities themselves, so one wonders whether anything has been accomplished other than the illusion of invisibility a child thinks he creates by pulling a blanket over his head.

As I have already noted, the amici tell us that federal regulations govern the quality of many newly constructed homes and have come to be followed industry-wide. The Court refuses to admit that such regulations exist or to acknowledge that similar standards could substitute for an implied warranty. The Court's intention appears to be to accept the industry's criticism and hold that warranties already commonly used in the industry can supersede an implied warranty. Again, however, the Court's inscrutable obscurity can only be expected to generate more disputes and more litigation, not settle the law.

## IV

Finally, there was a factual error in the Court's first opinion: Centex's warranty was not for a one-year period, as the Court stated.[28] The plaintiffs' pleading alleged that it was, as the Court's new opinion now states,[29] but there is nothing in the record to support the allegation, and they do not claim here that the warranty was for so short a period. Both plaintiffs and Centex have moved, at different times, to supplement the record with a copy of the warranty, which would establish that the warranty was for a longer period. It was well within the Court's discretion to deny these motions, but it is unfair to refuse to consider evidence and then repeat an allegation that everyone admits was incorrect.

The issue is significant for two reasons. The shorter the express warranty period, the more abusive it appears for builders to press it on buyers in lieu of an implied warranty that is not so limited. But more importantly, the refusal even to correct a plain factual misstatement in its opinion so as not to mislead the reader does not reflect well on this Court or on the process it has employed to reach a decision in this

---

**26.** *Ante* at 1216.

**27.** *Ante* at 268, 273, and 275.

**28.** 45 Tex. Sup.Ct. J. 1216, 1216 (Aug. 29, 2002).

**29.** *Ante* at 268.

case. The Court exposes itself to the criticism that its law may be as flawed as its facts. Its silence is assent.

\* \* \* \* \*

The Court should heed the arguments of Centex and the amici to reconsider its decision altogether. The Court's misstatement of fact, its mistaken assumption about the nature of express warranties of workmanship as they are actually used, and its serious misunderstanding of the nature and operation of the home construction industry can all be explained by the absence of a fully developed factual record that would indicate whether disclaimers of implied warranties are helpful or hurtful to builders and buyers overall. As I wrote in my first dissent, this issue cannot be resolved without factual information that the Court simply does not have. What we do know is that no other jurisdiction in the country has found it necessary or appropriate to prohibit disclaimers of the implied warranties of good workmanship and habitability, and that some jurisdictions have approved such disclaimers. Nothing in the record before us or in any research available to us demonstrates that such disclaimers should be forbidden in the State of Texas.

JUSTICE MAUZY famously ascribed the decision in *Melody Home* to the personal views of the MEMBERS of the Court.[30] Ironically, in revisiting the subject of implied warranties in this case, the Court has little more on which to base its decision.

For all these reasons and those previously expressed, I continue to dissent.

Justice OWEN, dissenting from the denial of the motion for rehearing.

I have become convinced by the amicus briefs filed in this case that the Court would benefit from granting rehearing and scheduling another argument. This case comes to us with absolutely no factual record. The trial court dismissed the plaintiffs' class action claims based on the pleadings. No evidence was offered by any party. We do not even have the express warranty that is at issue before us. Yet this Court was asked to decide and did decide whether the implied warranties of good workmanship and habitability can ever be waived in the sale of a new home, and if so, what such a waiver must contain to be effective. We have no idea what the practical impact of our holding will be on consumers.

I think it is fair to say that the Court's original opinion in this case reflected our lack of knowledge about the homebuilding industry, federal regulations that govern large segments of it, and the types of warranties that are widely used today. Nor is there any evidence in the record that tells us whether waivers of implied warranties or express warranties given in lieu of implied warranties have detrimentally impacted consumers and if so, what aspects of express warranties have proven to be deficient. Yet, in the face of our dearth of knowledge, we ventured to opine in amorphous terms what was required for an entire industry as a matter of *public policy*. That policy, once announced by this Court, is immutable unless the Court once again changes its mind,[1] or the Legislature acts. I now believe that it is unwise for this Court to make the kind of sweeping policy decision that it has made in this case without an adequate record or at least further briefing and argument.

Unlike the Legislature or a regulatory agency, this Court cannot hold hearings to determine whether regulation of an industry is needed and if so, what the precise

30. *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 362 (Mauzy, J., concurring).

1. *See G–W–L, Inc. v. Robichaux*, 643 S.W.2d 392 (Tex.1982).

contours of that regulation should be. We are limited to the record generated in a case, precedent from other courts, and scholarly ruminations. As already noted, we have no record here. And, the precedent from other courts weighs heavily in favor of allowing waivers of implied warranties in new home sales. Before this Court potentially voids hundreds if not thousands of express warranties and their accompanying waivers of implied warranties, we should know far more than we know today. Are we restoring rights to consumers or potentially voiding the purchase of homes for failure of consideration?[2] Are we assuring needed protections for consumers or needlessly adding to the cost of purchasing a home? Because we do not know the answers to these and many other questions, we should not undertake to issue a definitive decision unless and until we have more information. Accordingly, I would grant rehearing of this case. Because the Court does not, I dissent.

2. The waiver of implied warranties that is in the record before us specifically says, in large type, that the purchaser is accepting express warranties in lieu of implied warranties and that "PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER IS RELYING ON THIS WAIVER AND WOULD NOT SELL THE PROPERTY TO PURCHASER WITHOUT THIS WAIVER."