# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-04-00730-CV
NO. 03-04-00734-CV
NO. 03-04-00735-CV
NO. 03-04-00737-CV
NO. 03-04-00738-CV
NO. 03-04-00739-CV
NO. 03-04-00740-CV

**The Daneshjou Company, Inc., Appellant**

**v.**

**Joe Goergen**
**&**
**CNA Construction, Inc.**
**&**
**Modern Design and Construction, Inc.**
**&**
**Loredo Truss Company, Inc.**
**&**
**Loma Excavation, Inc.**
**&**
**G. P. Equipment Company**
**&**
**W. Lee Brown & Sons, Inc., Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NOS. GN403647, GN403032, GN402512, GN402481, GN403033, GN402513 & GN402685,
HONORABLE PAUL DAVIS, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

This appeal involves claims by a general contractor against its subcontractors. The

Daneshjou Company, Inc. ("DCI") was retained to build a house for Sandra Bullock. DCI hired

several subcontractors for the project, including appellees Joe Goergen, CNA Construction, Inc., Modern Design and Construction, Inc., Loredo Truss Company, Inc., Loma Excavation, Inc., G. P. Equipment Company, and W. Lee Brown & Sons, Inc. DCI and Bullock (together with John Bullock) filed suits against each other, and DCI filed third-party claims against its subcontractors to recover direct damages and for contribution and indemnity in the event it had to pay damages to the Bullocks. The appellee subcontractors filed motions for summary judgment and/or to dismiss. The trial court granted the motions in part or in whole, eventually disposing of all claims between DCI and these subcontractors. The trial court then severed the claims involving these subcontractors from the other claims in the case, and proceeded to trial on the remaining claims ("the Bullock trial"). DCI appeals the decisions in the cases involving these subcontractors.

DCI argues (1) that genuine issues of material fact exist, precluding summary judgment; (2) that severing the claims against the subcontractors while admitting evidence of their allegedly deficient work prejudiced DCI at the Bullock trial; and (3) that DCI should have been allowed to pursue its claims for contribution and indemnity against the subcontractors after the Bullock trial.

We find no reversible error in the trial court rulings challenged by DCI on appeal. The court did not err by dismissing all of DCI's third-party claims against G. P. Equipment for failure to serve citation timely. DCI's brief lacks argument or citation to facts or authorities showing error in the disposition of its direct claims against CNA and Modern. The record supports the summary judgments that DCI take nothing on its negligence, DTPA, contract, and warranty claims against Goergen, Loredo, Loma, and Brown. Further, the district court did not err by dismissing all

2

of DCI's claims for contribution and indemnity from appellees because (1) any contribution claims DCI had against any of its subcontractors for tort liabilities were released when DCI settled with the Bullocks after the Bullock trial; and (2) DCI's contractual indemnity claim against the subcontractors is unenforceable. Finally, no error in these causes can be predicated on events occurring in or around the Bullock trial after these causes were severed from the Bullock case. Accordingly, we affirm the district court's orders and judgments.

***Factual and Procedural Background***

DCI sued Sandra Bullock and John Bullock, personally and as trustee of Vito Pietanza, trustee of Band-Aid Trust, for breach of contract and tortious interference with employment and business relationships, alleging that the Bullocks delayed the progress of the construction of their house by DCI. The Bullocks counterclaimed for breach of contract, statutory/real estate fraud, fraudulent inducement, common-law fraud, and violations of the DTPA and the Racketeer Influenced Corrupt Organizations Act ("RICO").

DCI then filed third-party claims against its subcontractors, alleging that their work on the house was deficient. Several subcontractors filed motions seeking dismissal or summary judgment, among them:

- G. P. Equipment filed a motion to dismiss arguing that it had not been timely served with citation by DCI;

- Loredo filed no-evidence and traditional motions for summary judgment contending that the limitations period had expired on DCI's claims, that the DTPA was inapplicable, that it did not make any express warranties, that DCI's contractual indemnity claims were unenforceable, and that there was no evidence that its truss system was a cause in fact of any damage to the Bullocks; and

3

- Goergen, CNA, Modern, Loma, and Brown filed no-evidence motions for summary judgment and motions to dismiss asserting that DCI could not maintain its third-party action against them because DCI's claims were meritless, these subcontractors had settled Bullock's claims against them, and DCI's contractual indemnity claims against them were unenforceable.

Before the claims between DCI and the Bullocks were submitted to the jury, the trial court disposed of all claims involving the subcontractors by signing orders granting their motions for dismissal and/or summary judgment. The court then severed the claims involving these subcontractors from the Bullock case into individual suits, making the orders in the severed cases final. DCI appealed. After a jury delivered a verdict on the claims between DCI and the Bullocks,[1] DCI and the Bullocks settled all claims between them.

*Discussion*

DCI contends that the trial court erred by granting summary judgment in favor of various of the subcontractors, dismissing its other claims against various subcontractors, severing its claims against the subcontractors before trial while admitting evidence of their allegedly deficient work at the Bullock trial, and preventing DCI from pursuing its claims for contribution and indemnity against the subcontractors after the Bullock trial. However, DCI's claims in

---

[1] After all the claims involving the appellees in these causes had been severed from the Bullock case, the jury at the Bullock trial awarded the Bullocks $4,492,875 in actual damages, $560,850 in punitive damages, and attorneys' fees against DCI. The jury also awarded $841,275 in punitive damages against DCI's owner, M.B. "Benny" Daneshjou, individually.

4

these various appeals fail because (1) they are barred by limitations, (2) they are inadequately briefed, or (3) they lack merit.

## I. Claims against G. P. Equipment Co., No. 03-04-00739-CV

DCI contends that the trial court erred by enforcing the deadline for service of citation set in the Amended Docket Control Order when dismissing DCI's claims against G. P. Equipment. DCI first named G. P. Equipment as a third-party defendant in its Fifth Amended Third-Party Petition filed on September 26, 2003, more than two years after DCI filed the underlying cause. On November 23, 2003,[2] the state district court entered an Amended Scheduling Order stating that parties could be joined in this suit only if they were served by November 30, 2003. G. P. Equipment was served on December 2, 2003. G. P. Equipment moved to dismiss DCI's claims against it because it was not served by the deadline set in the trial court's Amended Docket Control Order. The trial court granted the motion to dismiss.

Trial courts have wide discretion in managing their dockets, and appellate courts will not interfere with the exercise of that discretion absent a showing of clear abuse. *Clanton v. Clark*, 639 S.W.2d 929, 931 (Tex. 1982); *see also Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240 (Tex. 2001) (trial court has inherent power to control disposition of cases "with economy of time and effort for itself, for counsel, and for litigants" (quoting *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936))). That discretion can be exercised through enforcement of a scheduling

---

[2] G. P. Equipment's Motion to Strike and Motion to Dismiss filed in the trial court recites that the scheduling order was entered on November 25, 2003. We will use the earlier date that is more favorable to the nonmovant, DCI.

order.  *See G.R.A.V.I.T.Y. Enters., Inc. v. Reece Supply Co.*, 177 S.W.3d 537, 542 (Tex. App.—Dallas 2005, no pet.); *Wil-Roye Inv. Co. II v. Washington Mut. Bank, FA*, 142 S.W.3d 393, 401 (Tex. App.—El Paso 2004, no pet.).  A trial court abuses its discretion when it acts arbitrarily or unreasonably without reference to any guiding rules and principles. *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006); *see also Herrera v. Seton Nw. Hosp.*, 212 S.W.3d 452, 462 (Tex. App.—Austin 2006, no pet.).

DCI does not challenge the deadline in the Amended Docket Control Order, but asserts that the court abused its discretion by refusing to deem that the service—which was executed on December 2, 2003—satisfied the November 30, 2003 deadline.  DCI asserts that it diligently sought to serve citation by the deadline, but was unable to accomplish service due to no fault of its own.  While the trial court might have chosen to ignore its newly-minted order and deem the service timely, we find no sound basis in the record or in the law on which to conclude that the trial court abused its discretion by declining to do so.  In dismissing the claims against G. P. Equipment, the court acted with reference to the guiding rule of its Amended Docket Control Order and concluded that service completed on December 2, 2003, did not comply with the order.[3]  To reverse, we would have to conclude that trial courts are not permitted to enforce their docket-control orders.  The law is to the contrary.  *See Clanton*, 639 S.W.2d at 931; *G.R.A.V.I.T.Y.*, 177 S.W.3d at 542.  We find no abuse of discretion in the trial court's order dismissing DCI's claims against G. P. Equipment.

---

[3]  DCI did not request findings on a claim of diligence.

**II.     Claims for negligence, DTPA violations, and breaches of warranty and contract**

    **A.     Claims against CNA Construction, No. 03-04-00734-CV, and Modern Design and Construction, No. 03-04-00735-CV**

The issue in DCI's brief regarding direct causes of action, presumably against the various subcontractors, actually contains no mention of CNA Construction or Modern Design and Construction, or any facts or authorities revealing error in the dismissals of CNA Construction and Modern Design and Construction.[4] DCI thus presents no error warranting reversal concerning these two appellees. *See* Tex. R. App. P. 38.1(h); *Ebner v. First State Bank of Smithville*, 27 S.W.3d 287, 303 n.28 (Tex. App.—Austin 2000, pet. denied).

    **B.     Claims against the remaining appellees**

DCI filed third-party claims against Goergen, Loredo, Loma, and Brown for negligence, breach of warranty, breach of contract,[5] and violation of the DTPA, and sought

---

[4] Although DCI's live pleading does not expressly exclude CNA and Modern from the scope of the direct claims, DCI's brief may more accurately reflect DCI's claims. Consistent with that view is the fact that CNA and Modern defend only against contribution and indemnity claims in their briefs. Either way, DCI cannot prevail on appeal on any direct claims against CNA and Modern.

[5] It is not clear that DCI's breach of contract claims applied to any party other than Eddie Tausch and King's Contracting. The allegations in the last-filed petition in the appellate record are as follows:

49.  Eddie Tausch and King's Contracting agreed to be "responsible for [the] correctness" of their scope of work under their contracts with Daneshjou or DCI, the terms of which are incorporated by this reference.

50.  If anyone proves that these Third-Party Defendants failed to comply with their agreements which caused any damages to Bullocks, then these Third-Party Defendants breached their contracts with Daneshjou and DCI which entitled Daneshjou and DCI to recover damages from the Subcontractor Third-Party Defendants.

contribution and indemnity. Each of these third-party defendants sought and was granted summary judgment on all claims against them except for claims for contribution. We will review the summary judgments on the direct claims first, then examine the contribution and indemnity claims.[6]

Because this review is on a grant of summary judgment, we will view the language "these Third-Party Defendants" and "the Subcontractor Third-Party Defendants" as applying to all appellees.

[6] The language of the petition conditions appellees' liability for the non-contract causes on DCI's liability to the Bullocks, which makes them sound like variations on contribution claims. The negligence, warranty, DTPA, and contract claims all appear in a section of the petition entitled "Additional Causes of Action" that is prefaced with the following language: "If DCI and Daneshjou are liable to the Bullocks, which is denied, then Third-Party Defendants are liable to Daneshjou and DCI to the full extent of any liability as follows: . . . ." The petition then describes how each of the causes of action lodged against DCI and Daneshjou arises, if at all, from the acts or omissions of Loma (and others) and, thus, the subcontractors should be held liable.

DCI bolstered the view of the non-contract claims as being variations on a broader claim for contribution. In its responses to these appellees' motions for summary judgment, DCI wrote:

> Daneshjou Company, Inc., can produce competent summary judgment evidence raising a genuine issue of material fact as to each element of each cause of action alleged in their Seventh Amended Third-Party Petition. If the Court views the evidence in the light most favorable to Daneshjou Company, Inc., they have provided competent summary judgment evidence presenting a genuine issue of material fact as to each element of its *breach of contract claim and contribution claims* under Chapters 32 and 33 of the Texas Civil Practice and Remedies Code and Tex. Bus. & Com. Code § 17.555.

(Emphasis added.) In another document, DCI wrote, "In order to recover damages under a negligence theory, in the context of a contribution cause of action . . . ." DCI used similar terminology regarding other causes of action.

However, in its motion to clarify the grant of some third-party defendants' (including Goergen, Loma, and Brown) motions for summary judgment, DCI argued that it was entitled to bring its "direct" claims, including those for breaches of warranty, DTPA, and contract.

For purposes of this review, which is of a grant of summary judgment, we will construe these pleadings in the light most favorable to DCI as making direct claims against all appellees for negligence, breach of contract, violation of the DTPA, and breach of warranty.

8

We review summary judgments de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). The subcontractors sought summary judgment on both traditional and no-evidence grounds. *See* Tex. R. Civ. P. 166a(c), 166a(i). To prevail on a traditional motion for summary judgment, the movant must establish the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). The filing of a no-evidence motion places the burden on the non-moving party to present evidence raising an issue of material fact as to the elements specified in the motion. Tex. R. Civ. P. 166a(i); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). In reviewing both types of summary judgment, we consider the evidence in the light most favorable to the non-movant and resolve any doubt in the non-movant's favor. *See Tamez*, 206 S.W.3d at 582; Urena, 162 S.W.3d at 550. When a trial court's order granting summary judgment does not specify the ground or grounds relied on for its ruling, summary judgment will be affirmed if any of the theories advanced and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

### 1. Claims against Joe Goergen, No. 03-04-00730-CV

DCI entered into an oral agreement with Joe Goergen to perform a radon assessment and install a radon mitigation system. Goergen completed the assessment in April 1998 and the installation by December 31, 1998. Goergen was first named in DCI's Fifth Amended Third-Party Petition, which was filed on September 26, 2003. DCI alleged that Goergen installed an unnecessary and unnecessarily expensive radon system.

9

Goergen filed traditional and no-evidence motions for summary judgment, contending that DCI's claims for DTPA violations, negligence, breach of warranty, and breach of contract were barred by the statutes of limitations. *See* Tex. Bus. & Com. Code Ann. § 17.565 (West 2002); Tex. Civ. Prac. & Rem. Code Ann. §§ 16.003(a), .051 (West 2002).

In its response, DCI did not refute or dispute the facts relating to the defense of limitations. It argued instead that, aside from its breach of contract claims, all of its claims were derivative of the Bullocks' claims against DCI and, therefore, did not accrue until the Bullocks sued DCI. The trial court granted partial summary judgment on all of DCI's claims in favor of Goergen, except for DCI's claim for contribution, which was later dismissed.

On appeal, DCI does not point to any evidence or raise any arguments that refute the existence of a valid limitations defense to its non-contribution claims against Goergen. The facts DCI lists in its appellate brief relate to whether Goergen performed his work well, not when the work was performed. The two-year period for filing suit against Goergen expired on December 31, 2000; the four-year period expired on December 31, 2002. DCI did not file suit until September 26, 2003. We find no error in the partial summary judgment granted on all of DCI's claims for direct damages against Goergen.

2. **Claims against Loredo Truss Company, Inc., No. 03-04-00737-CV**

Loredo delivered manufactured trusses[7] to the Bullock residence in September 1998. Although DCI accepted delivery and installed the trusses, in its suit DCI contended that the framing

---

[7] DCI alleged that Loredo, along with other companies, "performed the framing work" on the house. DCI does not pursue on appeal any complaints against Loredo related to the framing work other than the manufactured trusses.

members were unstable, inadequate, deficient, and below code. Loredo filed a motion for summary judgment, asserting that limitations barred DCI's claims and that its claims were otherwise meritless. Loredo later filed a no-evidence motion for summary judgment. The trial court granted Loredo's traditional motion as to all claims but the contribution claim, and by separate order granted Loredo's no-evidence motion without specifying the claims or bases on which it was granted.

The claims in this case are subject to both two-year and four-year limitations periods. DTPA and negligence claims are subject to two-year limitations periods. Tex. Bus. & Com. Code Ann. § 17.50 (West Supp. 2008); Tex. Civ. Prac. & Rem. Code Ann. § 16.003 (West Supp. 2008). Claims involving the sale of goods, including breach of contract, are subject to a four-year statute of limitations. Tex. Bus. & Com. Code Ann. § 2.725(a) (West 1994). "A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." *Id*. § 2.725(b). The trusses were moveable personal property at the time of the contract for sale, and constituted the sale of "goods" as defined by chapter 2 of the uniform commercial code. *See id*. §§ 2.102, .105. Claims for breach of contract are also subject to four-year limitations periods. Tex. Civ. Prac. & Rem. Code Ann. § 16.051 (West 1997).

The record supports the traditional summary judgment for many of the claims based on limitations. Loredo's president signed an affidavit swearing that Loredo manufactured and delivered the trusses. He averred that none of its trusses was rejected on delivery, that no complaints were made later to Loredo regarding defective materials, and that, consequently, Loredo did not

11

make any repair recommendations. Delivery of the trusses to the Bullock project site was completed in September 1998, and payment was completed in November 1998, but Loredo was not sued until December 11, 2002— more than four years later. Thus, the trial court properly concluded that DCI's claims against Loredo for DTPA violations, negligence, breach of contract, and breach of implied warranty were time-barred.

The existence of a letter memorializing a later inspection of the trusses does not provide evidence defeating either summary judgment. A letter—purportedly[8] from a Loredo representative to DCI and dated March 12, 1999—states, "The trusses that were installed at this address have been inspected and all are in place and correct." For an express warranty to extend to future performance, it must make specific reference to a specific date in the future. *Safeway Stores, Inc. v. Certainteed Corp.*, 710 S.W.2d 544, 548 (Tex. 1986). In *Safeway Stores*, the court held that a company's representation that "its 'Dual 80' roof was 'bondable up to 20 years'" created a fact question regarding whether an express warranty regarding future performance of the roof existed. There is no such express language in the record before us. The March 12 letter is not evidence of an express warranty made concurrently with the agreement to provide the trusses or at any other time. It does not make specific reference to a specific date in the future regarding performance. No evidence creates a genuine issue of material fact regarding whether Loredo made an express warranty at a time that would bring the filing of these claims within the limitations period. The trial court did not err by granting summary judgment on the express warranty claim.

---

[8] Loredo states in its brief that the authenticity of the letter was hotly contested, but concedes that, under our standard of review, we must presume it authentic.

### 3. Claims against Loma Excavation, No. 03-04-00738-CV

DCI hired Loma Excavation, Inc. to perform grading work that affected drainage patterns around Bullock's house. Loma sought summary judgment, arguing that there was no evidence that Loma had a contract with DCI or a duty of indemnity, that it made any express or implied warranties, that it performed any of the work for which DCI sought damages, that it breached any contract or warranty, or that its work damaged DCI or the Bullocks. The trial court granted Loma's no-evidence motion for summary judgment on all of DCI's claims except for contribution.[9] The trial court later granted Loma's motion to dismiss the contribution claim after Loma settled that claim with the Bullocks.

DCI contends that the trial court erred in granting summary judgment in favor of Loma because evidence in the record raised a genuine issue of fact on each element of its claims against Loma. DCI refers to deposition excerpts and/or affidavits from Larry Parker (DCI's expert), June Melton and David Shiflet (the Bullocks' experts), and Jim Burton (Loma's president). Collectively, these sources present evidence that Loma was hired to excavate, provide fill, and grade parts of the property. In his affidavit, Parker states that Loma was responsible for implementation of Robert Bellamy's drainage plan and that Melton's report recites that the "drainage plan promotes pooling and water intrusion around the home." There is evidence that Loma followed the design by Bellamy, but that the Bullocks and/or Daneshjou directed changes to the design. There was evidence that Loma did the final, fine grade of the property.[10] Melton saw water ponding in the front yard, and

---

[9] The trial court initially granted Loma's motion for summary judgment on all of DCI's claims against Loma. Later, the court granted DCI's motion to reconsider its grant of Loma's motion on the contribution claim related to the compaction of soil in the driveway area.

[10] There was also evidence that another company graded the property later.

13

said he had been told that water flowed directly toward the front of the house. Parker testified that, "in Loma's case, just because you're working by the hour doesn't mean that you don't have the responsibility not to drain water back toward the house."

No evidence in the record supports the warranty claims. DCI pleaded that the third-party defendants' conduct and products violated implied warranties under the business and commerce code including merchantability, fitness for purpose, workmanship, habitability, and freedom from defects. There is no evidence that Loma provided a product, so implied warranties of merchantability and fitness for purpose do not apply. Tex. Bus. & Com. Code Ann. §§ 2.314, .315 (West 1994); *G-W-L, Inc. v. Robichaux*, 643 S.W.2d 392, 394 (Tex. 1982) (implied warranties of the U.C.C. do not apply to the construction and sale of a house), *overruled on other grounds*, *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 355 (Tex. 1987). There is no evidence that any defect with the grading was latent, so the implied warranty of habitability does not apply.[11] *See Todd v. Perry Homes*, 156 S.W.3d 919, 921 (Tex. App.—Dallas 2005, no pet.). There is likewise no evidence that an implied warranty of freedom from defects exists in this case. *See generally Centex Homes v. Buecher*, 95 S.W.3d 266 (Tex. 2002). Finally, there is no evidence that Loma breached the implied warranty of good and workmanlike construction, which focuses on the builder's conduct rather than the quality of the completed structure. *Id*. at 272-73. The warranty of good and workmanlike construction has been defined as guaranteeing that construction occurred in "the manner in which an ordinarily prudent person engaged in similar work would have performed

---

[11] To the extent that these warranties extend to the buyer, there can be no evidence that Loma breached a duty to DCI. We will address separately DCI's claim for contribution and indemnity for damages awarded on these theories to the Bullocks. There is no evidence of any express warranty made by Loma.

14

under similar circumstances." *Miller v. Spencer*, 732 S.W.2d 758, 760 (Tex. App.—Dallas 1987, no writ). Parker's general opinion that, even if one is paid by the hour (and, in context of the hypothetical questions being posed, simply following directions), one should not grade land so that it drains toward a house is no evidence that, under the circumstances of this case and on this construction site, Loma failed to perform its services as an ordinarily prudent person would have. Parker simply did not offer any testimony that *Loma* should have done something other than what it did. There is no evidence to support the breach of warranty claims.[12]

Similarly, no evidence supports the other direct claims against Loma. Since it is the claim of breach of warranty that expressly forms the basis of DCI's DTPA claims,[13] there is no evidence to support a necessary element of DCI's DTPA claims. Further, "there is no discernible difference between a claim that efforts failed to be performed in a good and workmanlike manner and a claim that efforts were negligently performed." *Archibald v. Act III Arabians*, 755 S.W.2d 84, 86 (Tex. 1988).[14] Thus, no evidence supports the negligence claims. Finally, even assuming that

---

[12] Loma also notes that, although it was no longer a party to the Bullock case, issues related to its work were submitted to the jury at the trial of that case. We take judicial notice of the jury's answer to the question submitted at trial and made part of the appellate record in *The Daneshjou Company, Inc. v. Bullock*, Appellate Cause No. 03-05-00106-CV. The jury found that Loma did not breach a contract with DCI and that no failure by Loma to comply with a warranty—express or the implied responsibility to perform services in a good and workmanlike manner—was a producing cause of damages to the Bullocks.

[13] DCI states in its live pleading, "These breaches of express and implied warranties, if any, are, in part, the basis of the Bullocks' D.T.P.A. claim against DCI and Daneshjou, and are the basis of a claim by DCI and Daneshjou for violation of the Deceptive Trade Practices–Consumer Protection Act against named Third-Party Defendants."

[14] To the extent there is a difference between the standards of care in actions for negligence and breach of the warranty of good and workmanlike performance of services, the latter is the more demanding standard. *See Coulson v. Lake LBJ Mun. Util. Dist.*, 734 S.W.2d 649, 652 (Tex. 1987) (Spears, J., concurring) ("Negligence . . . does not necessarily encompass a breach of the implied warranty of good and workmanlike manner. An engineer could exercise due care, ordinary prudence

15

Loma was working under a contract, there is no evidence that Loma did anything inconsistent with the terms of that contract. The trial court did not err by granting summary judgment on DCI's claims against Loma.

### 4.    Claims against W. Lee Brown & Sons, No. 03-04-00740-CV

DCI hired Brown to perform exterior and interior millwork. In this suit, DCI alleged deficiencies in the quality, workmanship, and appearance of the millwork in Bullock's house. Brown filed a no-evidence motion for summary judgment, which was granted on all claims except the contribution claim. After Brown settled with the Bullocks, the court granted Brown's motion to dismiss and to sever its case from the other cases.

DCI failed to produce evidence linking Brown to any particular deficient work. According to DCI's petition, Brown was one of six companies performing interior and exterior millwork at Bullock's house. DCI produced evidence that Brown proposed to do trim carpentry work at Bullock's house, that Brown was paid for work done at the house, and that some trim carpentry work done at the house was deficient.[15] DCI attached to its response to the motion for summary judgment several proposals and invoices from Brown regarding work in various parts of the property in which Brown guaranteed that the work would be completed in a substantially workmanlike manner. Melton, DCI's expert, testified at his deposition that the majority of the

---

and perform reasonably but through mistake or ignorance, still render unskilled or shoddy services.") Thus, conduct that does not breach the warranty does not constitute negligence.

[15] Brown complains that DCI cited in its brief to a pleading filed in Goergen's case that referred to reports by DCI's expert, Melton. Brown asserts that such cannot be considered evidence in Brown's case because it is not evidence and was not filed in Brown's case. However, excerpts from Melton's deposition, containing statements similar to those filed in Goergen's case, were filed in this cause as an attachment to Daneshjou's motion to clarify or reconsider the grant of summary judgment that was filed before the court signed the order.

millwork and trim workmanship in the house was "pretty bad." Shiflet, the Bullocks' expert, described the quality of the interior millwork and trim work as "poor." Although the proposals mention the parts of the house in which Brown may have done work, they do not indicate what work Brown did in those areas or whether Brown was the only subcontractor working in the area. In the deposition excerpts, neither Melton nor Shiflet tied any specific deficient work to Brown. Melton testified that he did not know who supplied materials he deemed deficient or who installed or scheduled the installation of work that he considered unacceptable in the master bedroom. When Brown's counsel asked Shiflet in deposition, "Do you know what portion of [the interior millwork], if any, was completed by my client as opposed to other subcontractors?" he replied, "No idea." No evidence links Brown to any allegedly deficient work.[16]

This failure to link Brown to the bad millwork supports the trial court's grant of the no-evidence summary judgment on all of DCI's direct claims against Brown.

## III. Contribution and indemnity claims

DCI argues that the trial court erred by preventing it from seeking contribution and indemnity from appellees after the Bullock trial ended with a judgment in favor of the Bullocks.

---

[16] Though DCI does not use the term "res ipsa loquitur," its argument for and evidence of Brown's liability is essentially that Brown did trim work, some trim work was done badly, and, therefore, Brown is responsible for the bad trim work. However, res ipsa is a concept developed in the context of negligence claims. *See Mobil Chem. Co. v. Bell*, 517 S.W.2d 245, 251 (Tex. 1974); *Mathis v. Restoration Builders, Inc.*, 231 S.W.3d 47, 53 (Tex. App.—Houston [14th Dist.] 2007, no pet.). More critically, the res ipsa theory does not supply the missing causal link "when multiple defendants exercised control over the instrumentality and any one of them, wholly independent of the others, might have been responsible for the injury." *Mathis*, 231 S.W.3d at 53; *see also Marathon Oil Co. v. Sterner*, 632 S.W.2d 571, 573-74 (Tex. 1982). DCI was obligated to produce evidence tying Brown to specific, deficient work.

17

Before the severances and the Bullock trial, Loredo was granted summary judgment on DCI's contribution claims, and the other appellees sought and were granted dismissal of the contribution claims after they settled with the Bullocks. We need not examine whether the trial court properly disposed of appellees' motions regarding contribution because DCI's later settlement of the Bullocks' claims against it eliminated any right to contribution related to those claims. We also conclude that the trial court properly granted summary judgment with respect to DCI's indemnity claims because there is no evidence that DCI had a right to indemnification.

Any error in the trial court's judgment on the contribution claims was rendered harmless or waived by DCI's settlement of its liability to the Bullocks.[17] The right to contribution applies only to the tort and DTPA claims. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 32.001, 33.002 (West 2008). Because a party can settle only its proportionate share of responsibility, it has no right to obtain contribution to the settlement from other alleged tortfeasors. *Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 22 (Tex. 1987); *Filter Fab, Inc. v. Delauder*, 2 S.W.3d 614, 617 (Tex. App.—Houston [14th Dist.] 1999, no pet.). This holds true when the settlement occurs after trial and judgment establishing liability against the party seeking contribution—particularly when, as here, the other alleged tortfeasors settled their own potential liability with the injured party. *See Hardy v. Gulf Oil Corp.*, 949 F.2d 826, 832-33 (5th Cir. 1992); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 33.015(d) (West 2008) ("No defendant has a right of contribution against any settling person."). This is an exception to the general rule that parties

_____

[17] DCI concedes in its brief, "Following trial, Appellants settled with the Bullocks . . . ." We may take such an uncontradicted statement of fact as true. Tex. R. App. P. 38.1(f).

18

can sell or assign actions for personal injury. *Jinkins*, 739 S.W.2d at 22. The *Jinkins* court noted, "A settling defendant who is jointly responsible for personal injuries to a common plaintiff may not preserve contribution rights either by obtaining a complete release for all other parties allegedly responsible or by obtaining assignment of the plaintiff's entire claim." *Id*. DCI's settlement of its liability bars any contribution from any of the appellees in these cases, including Loredo. Accordingly, the record does not provide grounds for reversal of the dismissal of DCI's contribution claims.

DCI's complaints regarding the disposition of its indemnity claims also fail. In their motions for summary judgment, appellees asserted that there was no written contract for indemnity, no other circumstance giving rise to a duty to indemnify, and no statutory or common-law basis creating a duty to indemnify. DCI replied that the duty to indemnify arose from agreements memorialized by a paragraph appended to checks written to the subcontractors. DCI attached to its response to the various motions for summary judgment such checks made payable to Loma, Brown, Loredo, and others. We conclude that the trial court properly granted summary judgment as to DCI's claims for indemnity.

Indemnity agreements must satisfy a fair notice requirement to be enforceable. *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508-09 (Tex. 1993). The fair notice requirement comprises the express negligence doctrine and the conspicuousness requirement. *Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004). The express negligence doctrine requires that an intent to indemnify one of the parties from the consequences of its own negligence must be specifically stated in the four corners of the document. *Id*. at 192. Compliance

19

with the express negligence requirement is a rule of contract interpretation and, thus, a question of law for the court. *Fisk Elec. Co. v. Constructors & Assocs., Inc.*, 888 S.W.2d 813, 814 (Tex. 1994). The conspicuousness requirement mandates that something appear on the face of the contract to attract the attention of a reasonable person. *Reyes*, 134 S.W.3d at 192. Language is conspicuous if it appears in larger type, contrasting colors, or otherwise calls attention to itself. *Dresser*, 853 S.W.2d at 511; *see also* Tex. Bus. & Com. Code Ann. § 1.201(b)(10) (West Supp. 2008). If both contracting parties have actual knowledge of the plan's terms, an agreement can be enforced even if the fair notice requirements were not satisfied. *Reyes*, 134 S.W.3d at 192. Whether an agreement meets the conspicuousness requirement is a question of law for the court. *Dresser*, 853 S.W.2d at 509. An agreement that does not satisfy either of the fair notice requirements is unenforceable as a matter of law. *Reyes*, 134 S.W.3d at 192.

There is no evidence that DCI had a valid indemnity agreement with any of the appellees. No contract relating to the subcontractors' obligations or duties in the record contains an indemnity clause. There is no evidence that the subcontractors otherwise agreed to indemnify DCI at the time they agreed to provide the services or materials. The evidence DCI proffered to support the existence of an indemnity agreement was a paragraph appended to the checks used to pay the subcontractors. The indemnity language is in the midst of the paragraph discussing the various effects of accepting payment, including release of liens and relinquishment of claims. There is no evidence of negotiation or awareness of an indemnity agreement other than this language. The proposals and invoices from appellees in the record do not mention indemnity. The indemnity language is appended to a check for payment, rather than part of a writing memorializing the parties'

agreement regarding work to be performed or materials to be supplied.[18] Although it appears in a paragraph above the signature line on a page attached to a check, the indemnity language is inconspicuous as it is in small print in the midst of other topics printed in similarly sized and colored type.[19] There is no evidence that additional consideration was paid in exchange for the alleged agreement to indemnify proposed as a part of the payment.[20] An inconspicuous indemnity provision simply added to a check for payment after the formation of the original contract, without more, is not enforceable. We find no evidence in this record of an enforceable agreement by appellees to indemnify DCI. The court did not err by granting summary judgment against the indemnity claims.

## IV.  Appellate complaints based on severance and events occurring after the dismissals and summary judgments

DCI complains that the trial court erred in "dismissing appellees prior to trial and then allowing evidence to be admitted concerning the dismissed parties' allegedly defective work on the construction project." DCI also asserts that the trial court erred by "failing to allow appellant to pursue the claims of contribution and indemnity against appellees." DCI contends that the trial was unfair because, "[a]lthough evidence of the defective workmanship of Appellees was admitted, only

---

[18] The indemnity language does not appear on Brown's proposals or invoices that DCI contends are evidence of a contract. Further, we note that Brown's signature appears below the indemnification paragraphs on only one of the several checks submitted, and the notary blanks below that signature remain unfilled.

[19] As reproduced in the documents in the record, the indemnity language, along with the rest of the paragraph, appears to be in six-point type.

[20] For example, the checks made to Brown are in the same amount as the proposals and invoices sent by Brown that comprised the contract. We recognize that a "written contract presumes that there was consideration given for its execution." *See Wright v. Robert & St. John Motor Co.*, 58 S.W.2d 67, 69 (1933); *Hargis v. Radio Corp. of Am., Elec. Components*, 539 S.W.2d 230, 232 (Tex. Civ. App.—Austin 1976, no writ).

21

Appellant stood in front of the jury to be held responsible for the Bullocks' dissatisfaction." DCI contends that these causes should be remanded so that the trial court can "determine an equitable manner of distributing the burden to *Appellees, who actually built Sandra Bullock's House*."

We find no error in the severance of these causes of action. A court may sever part of a case before it is submitted to the trier of fact. Tex. R. Civ. P. 41; *see Guaranty Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990); *see also State Dep't of Highways & Transp. v. Cotner*, 845 S.W.2d 818, 819 (Tex. 1993). The trial court has broad discretion to sever causes. *Horseshoe*, 793 S.W.2d at 658. Here, the trial court severed all of DCI's third-party suits against appellees by August 26, 2004, after all claims against appellees were adjudicated, and before the suit between DCI and the Bullocks was submitted to the jury in October 2004. We find no abuse of discretion in the severance of these causes from the original cause of action.

No error in these causes can be premised on evidentiary rulings made at the Bullock trial, held after these causes were severed from that cause. Although the harm from errors committed in these causes may be cured by post-severance events in the Bullock case (as with the effect of settlement with the Bullocks on these claims), such later events cannot inject error into these causes after the judgments in them are final. DCI complains that, at the Bullock trial, the court admitted evidence concerning the severed parties' work on the construction project. DCI complains about the failure to enforce a motion in limine granted regarding the subcontractors' work. While that motion was granted before all of the claims against these appellees were severed, the motion pertained to the Bullock trial, which was submitted to the jury and went to judgment after the severance. The court's evidentiary decisions at the Bullock trial affected the result in that cause only, not the result in these causes disposed of without trial. The dismissals and summary judgments

22

rendered in these causes were supported by the records in these causes. The trial court acted within its discretion by severing these causes from the main cause. Any alleged error in admitting evidence in the Bullock trial is a matter to be taken up in that cause.

We also find no reversible error arising from any denials of DCI's request for contribution after the judgment was signed in the Bullock case. We do not find in the record of these causes documentation that, after the Bullock trial, DCI sought and was denied in these causes the right to seek contribution.[21] Even if DCI made such a request for contribution in the Bullock case after the judgments in these appeals were final, a denial of a request in that case cannot constitute error in these causes. Further, we have found that DCI had no right to contribution from appellees regarding liability to the Bullocks because of the Bullocks' settlements with the appellees and DCI. *See Jinkins*, 739 S.W.2d at 22. The court did not err by denying a nonexistent right.

Similarly, we find no reversible error arising from a denial of DCI's request for indemnity from appellees after the judgment in the Bullock case. The indemnity claims in these cases had already been rejected and these cases severed from the main action by the time of the Bullock trial. DCI asserts that it was "entitled to present evidence to the jury on indemnity claims against subcontractors." There was no jury in these cases because the claims in them were properly disposed either through dismissal or summary judgment. Whether such evidence should have been allowed at the Bullock trial is not a proper inquiry in any of the appeals in these severed, separate

---

**21** The only action close to such a denial in the record appears to be the overruling of a motion to reconsider the dismissal of or summary judgment on a claim for contribution or indemnity.

cases.[22] We conclude that the trial court did not erroneously prevent DCI from seeking indemnity in these cases after the Bullock trial.

## CONCLUSION

Having overruled DCI's three issues, we affirm the district court's dispositions of the claims against these appellees.

G. Alan Waldrop, Justice

Before Chief Justice Law, Justices Puryear and Waldrop

Affirmed

Filed:   August 8, 2008

---

[22] Whether DCI could have sought a finding of the proportionate responsibility of these parties in the Bullock trial is an issue for that cause, not these causes. *See generally* Tex. Civ. Prac. & Rem. Code Ann. § 33.003 (West Supp. 2008) (permitting such findings in proper circumstances).