Opinion issued August 28, 2025



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00874-CV

———————————

**SAM MATHEWSON, Appellant**

**V.**

**ANGLIA HOMES, L.P., Appellee**

On Appeal from the 295th District Court
Harris County, Texas
Trial Court Case No. 2020-56673

## MEMORANDUM OPINION

Sam Mathewson filed a construction-defect suit after discovering mold in the new house he bought from Anglia Homes, L.P. He sued for breach of contract, breach of the implied warranties of habitability and good workmanship, negligent construction, and violations of the Deceptive Trade Practices Act. The trial court

rendered summary judgment in favor of Anglia Homes. In three issues on appeal, Mathewson argues: (1) he filed suit timely; (2) the summary judgment evidence did not establish that Anglia Homes disclaimed the implied warranties or the DTPA claims; and (3) the economic loss rule did not defeat his claims for negligent construction and DTPA violations. We affirm in part and reverse and remand in part.

## Background

The facts that matter most involve the dates and the contract terms. In March 2016, Mathewson signed a purchase agreement for Anglia Homes to construct a new home in Baytown. After Anglia Homes completed construction of the home, the transaction closed on September 28, 2016.

Along with the purchase agreement in March 2016, Mathewson signed the following Notice and Disclaimer Regarding Mold:

> The continued presence of moisture within a home, such as from leaks, condensation, spills, etc., can cause the propagation of molds, fungus or mildew that may cause allergenic reactions and other health problems in some individuals. Upon taking possession of the home, you [Mathewson] are responsible for implementing an inspection and maintenance program for the identification and elimination of moisture in the home that could give rise to the growth of mold or other conditions detrimental to the functioning of the home or health of its occupants. To better protect the home from the growth of molds, fungus and mildew, you should consider, among other things, [taking certain actions, such as fixing plumbing leaks, regularly servicing air handling units, and using the air conditioner or a dehumidifier during humid months.]

> While Anglia Homes, L.P. will correct any leak or other condition that is covered by the limited warranty, it is not liable for any consequential

damages arising from plumbing leaks or other warranty claims and specifically DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, AGAINST OR ANY RESPONSIBILITY OR LIABILITY FOR MOLD, MILDEW OR FUNGUS, including damages for any illness or allergic reactions as well as costs of remediation, inspection or testing, regardless of the source of the moisture that caused or contributed to [the] condition.

By signing below, you agree to the foregoing disclaimer and acknowledge your responsibility to keep the residence clean, dry and free of contamination. . . .

At closing, Anglia Homes provided Mathewson with a Builders Warranty and Building Standards for his new home. The warranty included a workmanship, materials, and systems warranty and provided a detailed description of construction performance standards. These standards addressed mold and stated that mold "can form as a result of leaks or condensation." But like the mold disclaimer, the warranty assigned to Mathewson all responsibility for mold in the home.

Within three years of closing, Mathewson hired a company to test his home for mold. On May 22, 2019, the company issued a report revealing the presence of mold. In July 2019, Mathewson sent Anglia Homes a letter notifying it of construction defects pursuant to the Residential Construction Liability Act. *See* TEX. PROP. CODE § 27.004(a). The letter informed Anglia Homes that Mathewson's "home has substantial mold growth and elevated mold spore counts throughout." Mathewson alleged that Anglia Homes inspected his home but refused to make an offer of settlement under the RCLA. *See id.* § 27.004(a)–(b).

On September 15, 2020, Mathewson filed the underlying lawsuit. He alleged that Anglia Homes sold him a house with "multiple construction defects that have caused significant mold growth in [his] home." The house "began experiencing unacceptably high levels of relative humidity and condensation" which caused "water damage and the development of elevated mold levels" and "will require extensive remediation as well as the replacement and cleaning of [the] contents." He blamed the mold on "construction defects relating to [Anglia Homes'] design and construction of the Home."

Mathewson asserted claims for breach of contract, breach of the implied warranties of habitability and good workmanship under both the common law and the DTPA, negligent construction, and additional violations of the DTPA. *See* TEX. BUS. & COM. CODE §§ 17.46(b), 17.50(a)(2). He also invoked the discovery rule.

The same day he filed the petition, Mathewson requested issuance of citation to Anglia Homes through its registered agent, GG Twin Assets GP. He then sent the citation and petition to the registered agent by certified mail, return receipt requested, on September 18, 2020—a few days after filing the petition. But he mailed service to an outdated address for the registered agent, an address which he had obtained from an incorrect listing on the Secretary of State's website.[1] A tracking printout

---

[1]    Neither party appears to be at fault for the incorrect listing.

from the postal service's website stated that the "item was delivered to an individual" at the address, but the return receipt did not contain a recipient's signature.

Anglia Homes denies it was served. It asserts that Mathewson did not communicate with its counsel from August 2019—when counsel inspected the alleged mold pursuant to the RCLA demand letter—until September 2022 when Mathewson sent Anglia Homes post-judgment discovery in this case.

Little happened in the case from its filing in September 2020 until April 2022. The trial court twice issued notices of intent to dismiss the case for want of prosecution. Mathewson filed verified motions to retain. The court granted the first motion but denied the second motion and dismissed the suit. Mathewson filed a motion for new trial, which the court granted, reinstating the suit. In April 2022, Mathewson moved for a default judgment based on Anglia Homes' failure to appear. The court granted the motion and signed a default judgment against Anglia Homes in May 2022.

In October 2022, after receiving post-judgment discovery from Mathewson, Anglia Homes filed a bill of review arguing in part that the default judgment was obtained without service of process. Anglia Homes saw service as ineffective because Mathewson attempted to serve process at the wrong address, and the return receipt was not signed as required by Rule of Civil Procedure 107(c). The trial court signed an agreed order granting the bill of review, vacating the default judgment,

5

and reinstating the case. The order stated that "service was not properly made upon Anglia Homes[.]"

Anglia Homes filed its original answer on February 28, 2023. It asserted several defenses, including limitations.

Anglia Homes then filed a traditional motion for summary judgment on several grounds. It primarily relied on its limitations defense, arguing that Mathewson never effectively served process because the return receipt was not signed after Mathewson attempted service by mail in September 2020, and Mathewson did not exercise due diligence by making further service attempts. Anglia Homes argued that it was constructively served when it filed its answer in February 2023, and this date did not relate back to the September 2020 original petition. Anglia Homes further argued that Mathewson's claims accrued when the parties closed in September 2016, the discovery rule did not apply because mold is not inherently undiscoverable, and therefore all claims came too late. Alternatively, it argued that if the discovery rule applied, the claims accrued when Mathewson received the May 2019 mold report.

Anglia Homes also sought summary judgment on the merits of all Mathewson's claims except the breach of contract claim. It asserted that the mold disclaimer and builders warranty waived the implied warranties of habitability and

good workmanship. It also asserted that the economic loss rule barred Mathewson's negligence and DTPA claims.

Anglia Homes attached several documents to its motion, including the citation and return receipt, the purchase agreement, the mold disclaimer, the builders warranty, the May 2019 mold report, and the July 2019 RCLA demand letter.

Mathewson filed a response arguing that Anglia Homes did not conclusively establish its limitations defense. Without addressing the omission of a signature on the return receipt, Mathewson focused on the incorrect address listed on the Secretary of State's website and argued that he should not be charged with the error. He contended that he properly served Anglia Homes immediately after filing suit, and at the very least, a fact issue existed about his diligence.

On the merits, Mathewson argued that the mold disclaimer and builders warranty did not adequately disclaim the implied warranties of habitability and good workmanship under Texas law. Mathewson relied on much of Anglia Homes' summary judgment evidence—including the citation and unsigned return receipt—although he also attached an affidavit from his attorney and a public information report maintained by the Secretary of State.

Anglia Homes filed a reply reiterating that the return receipt did not contain a signature as required by Rule 107(c), Mathewson made no further service attempts, and therefore he was not diligent as a matter of law. Anglia Homes also argued that

7

the discovery rule did not apply. Mathewson filed a sur-reply arguing that the economic loss rule did not apply to bar his tort claims.

Without specifying the grounds for its ruling, the trial court granted summary judgment and ordered that Mathewson take nothing. This appeal followed.

**Summary Judgment**

In three issues on appeal, Mathewson argues that the trial court erred by granting summary judgment because: (1) he filed suit and served Anglia Homes within two years of accrual of his claims, thereby satisfying both the two- and four-year limitations statutes; (2) Anglia Homes did not conclusively establish that it met the strict standards required to disclaim the implied warranties of habitability and good workmanship and to waive DTPA claims; and (3) the economic loss rule does not bar his negligent construction and DTPA claims.

**A.    Standard of Review**

We review a traditional summary judgment ruling de novo under a well-established standard. *See Wolford v. Am. Home Assurance Co.*, 263 S.W.3d 12, 15–16 (Tex. App.—Houston [1st Dist.] 2006, no pet.); TEX. R. CIV. P. 166a(c). As discussed below, we apply a burden shifting standard to review summary judgment issues concerning limitations. *Draughon v. Johnson*, 631 S.W.3d 81, 88–89 (Tex. 2021).

## B.     Statutes of Limitations

In his first issue, Mathewson argues that summary judgment was improper on the ground of limitations. The parties agree that Mathewson's claims have two- and four-year limitations periods and that limitations began running when he first became injured under the single-injury rule.[2] But the parties dispute both (1) when the claims accrued and thus limitations began to run and (2) whether suit was filed within the limitations periods.

Mathewson argues that the discovery rule applies, and therefore his claims accrued when he discovered his home had mold after receiving a report in May 2019. He filed suit less than two years later in September 2020, and he contends that he diligently served process to Anglia Homes by certified mail a few days later.

Anglia Homes asserts that mold is not inherently undiscoverable as required to apply the discovery rule, and therefore Mathewson's claims accrued when the parties closed on the house in September 2016. Anglia Homes further asserts that the September 2020 service attempt was ineffective, and Mathewson made no further attempt to serve process. Thus, Anglia Homes argues that limitations did not

---

[2]     *See Regency Field Servs., LLC v. Swift Energy Operating, LLC*, 622 S.W.3d 807, 815 (Tex. 2021) ("[U]nder the single-action rule, a defendant's wrongful conduct gives rise to a single, indivisible action in which the claimant must pursue all claims for all damages resulting from all injuries that arise from the wrongful conduct, and those claims all accrue when the first such injury occurs.").

stop running until it filed an answer in February 2023—more than four years after the claims accrued.

### 1. Applicable Law

A defendant who moves for summary judgment based on limitations bears the burden to conclusively establish the elements of the defense. *Id.* at 88 (quotation omitted). Thus, the defendant must conclusively prove (1) when the cause of action accrued and (2) that the plaintiff filed suit after "the statute of limitations has run." *Id.* at 89 (quotation omitted). The defendant must establish "any issues raised that affect which days count toward the running of limitations—such as accrual, the discovery rule, and tolling." *Id.* at 88. If the defendant conclusively establishes the defense, the burden shifts to the plaintiff to raise a fact issue on any equitable defense to limitations, including diligent service. *Id.* at 89; *see also Gill v. Hill*, 688 S.W.3d 863, 870 (Tex. 2024) ("Ultimately, the distinction *Draughon* draws [between the parties' summary judgment burdens on limitations issues] is between defenses that avoid the statute of limitations entirely and those that toll certain days.").

### a. Accrual and the discovery rule

A statute of limitations bars a party from asserting a right after a specified period. *LaTouche v. Perry Homes, LLC*, 606 S.W.3d 878, 883 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). The limitations period begins to run when the claim accrues. *Id.* When a plaintiff asserts that the discovery rule tolls accrual, the

defendant has the burden to negate the rule by conclusively establishing that (1) the rule does not apply, or (2) if the rule applies, the summary judgment evidence negates it. *Draughon*, 631 S.W.3d at 90.

"Generally, a claim accrues when the defendant's wrongful conduct causes the claimant to suffer a legal injury, which gives the claimant the right to seek a judicial remedy." *Regency Field Servs., LLC v. Swift Energy Operating, LLC*, 622 S.W.3d 807, 814 (Tex. 2021). But the discovery rule can defer accrual of a claim when "the alleged wrongful act and resulting injury were inherently undiscoverable at the time they occurred but may be objectively verified." *Draughon*, 631 S.W.3d at 89 (quotation omitted); *see Archer v. Tregellas*, 566 S.W.3d 281, 290 (Tex. 2018) ("These two elements attempt to strike a balance between the policy underlying statutes of limitations (barring stale claims) and the objective of avoiding an unjust result (barring claims that could not be brought within the limitations period)."). When applicable, the discovery rule tolls accrual "until the plaintiff knew or in the exercise of reasonable diligence should have known of the wrongful act and resulting injury." *Draughon*, 631 S.W.3d at 89. The rule is limited to "exceptional cases to avoid defeating the purposes behind the limitations statutes." *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006) (per curiam); *see S.V. v. R.V.*, 933 S.W.2d 1, 25 (Tex. 1996) (stating that exceptions to legal injury rule—including application of discovery rule—"should be few and narrowly drawn").

An injury is inherently undiscoverable if the injury is "unlikely to be discovered within the prescribed limitations period despite due diligence." *Archer*, 566 S.W.3d at 290 (quotation omitted); *see S.V.*, 933 S.W.2d at 7 (stating that injury "need not be absolutely impossible to discover"). This determination is based on the category of injury rather than the facts of the individual case. *Archer*, 566 S.W.3d at 290. That is, we consider not whether the particular injury could have been discovered with diligence, but whether the injury was "the type of injury that could be discovered through the exercise of reasonable diligence." *Id.* (quotation omitted); *see Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 735 (Tex. 2001) (stating that categorical approach "brings predictability and consistency to the jurisprudence" of discovery rule) (quotation omitted).

### b. End of limitations period

A party must "bring suit" within the applicable limitations period to vest jurisdiction in the trial court. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE §§ 16.002–.013, 16.051. "Bringing suit" requires both filing an original petition and effecting service of process. *City of Houston v. Meka*, 697 S.W.3d 656, 657 (Tex. 2024) (per curiam). Merely filing suit does not stop the running of limitations unless the plaintiff exercises due diligence in issuing and serving citation on the defendant. *Draughon*, 631 S.W.3d at 93–94 (quotation omitted); *Proulx v. Wells*, 235 S.W.3d 213, 215 (Tex. 2007) (per curiam). If the plaintiff diligently effected service after

limitations expires, the date of service relates back to the date the petition was filed. *Proulx*, 235 S.W.3d at 215.

A defendant can meet its summary judgment burden to conclusively establish that limitations expired by proving that the plaintiff failed to timely serve the defendant. *Draughon*, 631 S.W.3d at 94 (quotation omitted). The burden then shifts to the plaintiff to explain the delay and raise a fact issue concerning the diligence of service efforts. *Id.* (quotations omitted). The plaintiff must show that he acted as an ordinarily prudent person would have acted under the same or similar circumstances and was diligent until the time he served the defendant. *Proulx*, 235 S.W.3d at 216. The plaintiff must explain every lapse between service efforts or period of delay. *Id.* Diligence is generally a fact question, but the plaintiff's explanation may demonstrate a lack of due diligence as a matter of law if, for example, one or more lapses between service efforts are unexplained or patently unreasonable. *Id.*

2. **Analysis**

Mathewson asserted several causes of action, and the parties agree about the limitations periods for each one. The causes of action for breach of contract and breach of the implied warranties of habitability and good workmanship have four-year limitations periods. *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 707 (Tex. 2021) (breach of contract); *Nghiem v. Sajib*, 567 S.W.3d 718, 725 (Tex. 2019) (breach of warranty). The causes of action for negligent construction and violations

of the DTPA have two-year limitations periods. *See* TEX. CIV. PRAC. & REM. CODE § 16.003(a) (injury to property); *Fish v. Marsters Co.*, No. 14-06-00129-CV, 2007 WL 1438555, at \*7 (Tex. App.—Houston [14th Dist.] May 17, 2007, pet. denied) (mem. op.) (negligent construction); TEX. BUS. & COM. CODE § 17.565 (DTPA).

### a. The discovery rule applies and tolls accrual of the claims to May 22, 2019

The parties first dispute whether Mathewson's claims accrued in September 2016 when the house sale closed or in May 2019 when the report issued revealing mold in Mathewson's home. Mathewson "agrees that he knew about mold in his home" on May 22, 2019. But he asserts that Anglia Homes did not meet its burden to prove that he discovered or should have discovered mold or its causes earlier. We agree.

In his petition, Mathewson alleged that the discovery rule applied to his claims because he "did not discover, nor could [he] have discovered by the exercise of reasonable diligence, the existence of his causes of action against [Anglia Homes] until less than two years" before he filed suit. Because Mathewson pleaded the discovery rule, Anglia Homes had the burden to conclusively establish that (1) the rule did not apply, or (2) if the rule applied, no fact issue existed about when Mathewson discovered, or in the exercise of reasonable diligence should have discovered, the nature of the injury. *See Draughon*, 631 S.W.3d at 89, 90. Anglia Homes did not meet this burden.

14

Anglia Homes argues that Mathewson's claims accrued in September 2016 when the parties closed and Anglia Homes delivered the new home to Mathewson. Anglia Homes sees the discovery rule as inapplicable because mold is not inherently undiscoverable. In support, Anglia Homes points out that: (1) Mathewson actually knew of the presence of mold in his home in May 2019, and thus he learned of his alleged injury within the four-year limitations period applicable to breach of contract claims; and (2) a mold disclaimer accompanying the purchase agreement notified Mathewson to monitor his house for moisture and mold. These arguments are unpersuasive.

It is well-established that the discovery rule applies to claims concerning construction defects and mold in residential property. *E.g.*, *S.V.*, 933 S.W.2d at 6–7 (listing cases involving allegations of faulty construction as examples of "inherently undiscoverable" element of discovery rule); *Pirtle v. Kahn*, 177 S.W.3d 567, 572–74 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (applying discovery rule to allegations that tenant became ill because of mold in her apartment despite assertion that discovery rule did not apply to her claims); *J.M. Krupar Constr. Co. v. Rosenberg*, 95 S.W.3d 322, 329–30 (Tex. App.—Houston [1st Dist.] 2002, no pet.) ("Generally, in construction-defect cases, limitations begin to run when an owner becomes aware of property damage.") (collecting cases); *Holiday Inn Club Vacations Inc. v. CBRE, Inc.*, No. 14-23-00976-CV, 2025 WL 383161, at *7 (Tex.

15

App.—Houston [14th Dist.] Feb. 4, 2025, pet. filed) (mem. op.) (collecting cases). Anglia Homes has not cited any legal authority supporting its position that the discovery rule does not apply to construction defect or mold claims.

We disagree with Anglia Homes that Mathewson's actual knowledge of the presence of mold within four years after closing conclusively negates application of the discovery rule. Whether an injury is inherently undiscoverable for purposes of the rule is based on the category of the injury rather than the facts of the individual case. *See Archer*, 566 S.W.3d at 290. As discussed above, courts have concluded that construction defect and mold claims allege the type of injury to which the rule applies. That Mathewson happened to discover mold due to alleged construction defects within four years of closing does not mean that construction defects involving mold are the type of claims likely to be discovered within the limitations period. *See id.* (stating that injury is inherently undiscoverable when it is "unlikely to be discovered within the prescribed limitations period despite due diligence") (quotation omitted).

We also disagree with Anglia Homes that an injury is not inherently undiscoverable when the injured party was notified to monitor for the injury. Anglia Homes relies on the mold disclaimer to argue that Mathewson was so notified. In pertinent part, the disclaimer notified Mathewson that "[t]he continued presence of moisture within a home, such as from leaks, condensation, spills, etc., can cause the

16

propagation of molds, fungus or mildew that may cause allergenic reactions and other health problems in some individuals." It further notified Mathewson that he is "responsible for implementing an inspection and maintenance program for the identification and elimination of moisture in the home that could give rise to the growth of mold," and it listed several actions Mathewson "should consider" to eliminate moisture in his new home.

The disclaimer thus notified Mathewson that he should exercise diligence in identifying and eliminating potential mold-causing moisture in his home, a duty already imposed upon him by the discovery rule: An injury is inherently undiscoverable when it is "unlikely to be discovered within the prescribed limitations period despite due diligence." *See id.* (quotation omitted). But this says nothing about the likelihood of discovering mold within the limitations period with the exercise of such diligence. As stated above, applicability of the discovery rule depends on the category of injury, not the facts of the individual case. *Id.* Anglia Homes did not meet its burden to conclusively establish that the discovery rule does not apply to Mathewson's claims. *See Draughon*, 631 S.W.3d at 88–90; *Wolford*, 263 S.W.3d at 15–16.

We conclude that the discovery rule applies to Mathewson's claims. The parties agree that if the rule applies, then Mathewson's claims accrued when he received the May 22, 2019 report disclosing the presence of mold in his home.

17

Accordingly, the summary judgment evidence establishes that Mathewson's claims accrued on May 22, 2019. Based on the date of accrual, the two-year limitations period expired on May 22, 2021, and the four-year limitations period expired on May 22, 2023.

**b. Limitations stopped running on February 28, 2023, when Anglia Homes was constructively served**

Next, the parties dispute whether limitations stopped running when Mathewson filed suit and mailed the citation to Anglia Homes in September 2020—less than two years after the claims accrued—or when Anglia Homes filed its answer on February 28, 2023—more than two years but less than four years after the claims accrued. Here, we agree with Anglia Homes that limitations stopped running on February 28, 2023.

Mathewson contends that he properly served Anglia Homes by certified mail even though he mailed it to an incorrect address. Mathewson obtained the address for Anglia Homes' registered agent from the Secretary of State's website, which mistakenly listed the wrong address through no fault of either party. Mathewson nevertheless contends that the error should be charged against Anglia Homes and in favor of effective service. But the issue of the incorrect address is immaterial to our analysis because the return receipt was not signed, thereby rendering the service attempt ineffective.

Rule of Civil Procedure 106 authorized Mathewson to serve process by "mailing to [Anglia Homes] by registered or certified mail, return receipt requested, a copy of the citation and of the petition." *See* TEX. R. CIV. P. 106(a)(2). When citation is served by registered or certified mail, Rule 107 requires that "the return by the officer or authorized person must also contain the return receipt with the addressee's signature." TEX. R. CIV. P. 107(c). If the return receipt is not signed by the addressee, the service of process is defective and invalid. *Keeton v. Carrasco*, 53 S.W.3d 13, 19 (Tex. App.—San Antonio 2001, pet. denied) (collecting cases); *Ramirez v. Consol. HGM Corp.*, 124 S.W.3d 914, 916 (Tex. App.—Amarillo 2004, no pet.).

Anglia Homes' summary judgment evidence contained the return receipt, but it is unsigned and therefore defective. *See* TEX. R. CIV. P. 107(c); *Keeton*, 53 S.W.3d at 19. Anglia Homes has consistently argued that service was ineffective due to the unsigned return receipt: It first raised the issue in its bill of review, and again in its answer, and again in its motion for summary judgment. It continues to do so on appeal. And while Mathewson argues on appeal that the "return of service showed on its face that service was made in strict compliance with Texas Rule of Civil

Procedure 106," he has never addressed the lack of a signature on the return receipt and whether the return therefore complied with Rule 107.[3]

Instead, Mathewson relies on a postal service tracking printout stating that the "item was delivered to an individual" at the listed address. But this printout is not the return receipt required by Rule 107, and it too is unsigned. *See* TEX. R. CIV. P. 107(c); *Keeton*, 53 S.W.3d at 19. The printout does not even identify the "individual" who received the item. Because the return receipt is not signed, Mathewson's service attempt is invalid regardless of whether he attempted service at the correct address.

Furthermore, the invalid service attempt concerns whether Mathewson exercised due diligence in effecting service. Once Anglia Homes met its summary judgment burden to establish that service was invalid and thus limitations continued running, the burden shifted to Mathewson to prove he used diligence in serving Anglia Homes. *See Draughon*, 631 S.W.3d at 93–94. This he did not do.

The record contains no evidence that Mathewson made any additional service attempts after the first attempt in September 2020 until Anglia Homes filed an answer in February 2023. Exercising due diligence required Mathewson to review the return receipt, realize that it was not signed and that service was thus ineffective,

---

[3] Matthewson asserted for the first time in his reply brief that the "return of service on [Anglia Homes'] registered agent strictly complies with every requirement set out under Rule 107(a), (b), (c), (d), and (e)," yet he still did not address the unsigned return receipt.

and diligently attempt to properly serve Anglia Homes. Mathewson does not dispute that he made no further service attempts, relying instead solely on the invalid September 2020 service attempt.[4] He also does not dispute that if this service attempt was invalid, then Anglia Homes was effectively served on February 28, 2023, when it filed its answer. *See* TEX. R. CIV. P. 121 ("An answer shall constitute an appearance of the defendant so as to dispense with the necessity for the issuance or service of citation upon him."). An unexplained lapse of more than two years between service attempts demonstrates a lack of diligence as a matter of law. *See Proulx*, 235 S.W.3d at 216; *see also Ashley v. Hawkins*, 293 S.W.3d 175, 180–81 (Tex. 2009) (holding that eight-month unexplained gap between service efforts shows lack of diligence as matter of law).

Because Mathewson did not meet his summary judgment burden to raise a fact issue concerning his diligence in serving Anglia Homes, the service date did not relate back to the date the petition was filed. *See Proulx*, 235 S.W.3d at 215. We therefore conclude that limitations did not stop running until February 2023, more than two years but less than four years after Mathewson's claims accrued in May 2019.

---

[4] For its part, Anglia Homes argues that it had no communication with Mathewson from August 2019—when it inspected his home pursuant to the July 2019 RCLA notice letter—until Mathewson sent it post-default-judgment discovery in September 2022. Anglia Homes successfully sought a bill of review and filed an answer in February 2023.

21

We hold that the trial court properly granted summary judgment on the DTPA and negligent construction claims, which each had a two-year limitations period that expired on May 22, 2021.[5] We further hold that the trial court erred by granting summary judgment on the breach of contract claim, which had a four-year limitations period that expired on May 22, 2023, because Anglia Homes challenged this claim solely based on limitations. Finally, we hold that the trial court erred by granting summary judgment on the common-law breach of implied warranty claims to the extent it did so on limitations. These claims also had a four-year limitations period that expired on May 22, 2023. But Anglia Homes raised additional challenges to the breach of implied warranty claims, and we address those challenges below.

We sustain Mathewson's first issue in part.

## C. Implied Warranties of Habitability and Good Workmanship

In his second issue, Mathewson contends that the summary judgment evidence does not conclusively establish that Anglia Homes disclaimed the implied warranties of habitability and good workmanship.

### 1. Applicable Law

The implied warranties of habitability and good workmanship "provide separate and distinct protection for the new home buyer." *Centex Homes v. Buecher*,

---

[5]     Based on this holding, we do not consider the part of Mathewson's second issue concerning the DTPA claims or his third issue concerning the merits of the negligent construction and DTPA claims. *See* TEX. R. APP. P. 47.1.

95 S.W.3d 266, 272 (Tex. 2002). Whereas the implied warranty of good workmanship focuses on the builder's conduct, the implied warranty of habitability focuses on the state of the completed structure. *Id.* at 272–73; *see also Lennar Homes of Tex. Land & Constr., Ltd. v. Whiteley*, 672 S.W.3d 367, 378 (Tex. 2023) (stating that "different implied warranties behave differently") (quotation omitted).

The implied warranty of good workmanship "recognizes that a new home builder should perform with at least a minimal standard of care." *Centex Homes*, 95 S.W.3d at 273. The builder must construct the home in the same manner as would a generally proficient builder engaged in similar work and performing under similar circumstances. *Id.* The implied warranty of good workmanship is a "gap-filler" or "default warranty" that applies unless the parties express a contrary intent, such as in an express warranty. *Id.* But the parties cannot simply disclaim the implied warranty of good workmanship. *Id.* at 274. Rather, the implied warranty can be disclaimed only when the parties' agreement specifically describes the manner, performance, or quality of the desired construction. *Id.* at 273, 274–75.

By contrast, the implied warranty of habitability is more limited in scope and protects a home purchaser only from defects that undermine the basis of the bargain. *Id.* at 273. The builder must provide a house that is safe, sanitary, and otherwise fit for human habitation. *Id.* A form of strict liability, this implied warranty "only protects new home buyers from conditions that are so defective that the property is

23

unsuitable for its intended use as a home." *Id.* While parties may define for themselves the quality of workmanship, the implied warranty of habitability is an essential part of a new home sale. *Id.* at 274. The implied warranty of habitability can be disclaimed "only to the extent that defects are adequately disclosed," such as "when a purchaser buys a problem house with express and full knowledge of the defects that affect its habitability." *Id.* This warranty does not include defects, even substantial ones, that are known by or expressly disclosed to the buyer. *Id.* at 275. But the warranty may not be disclaimed generally. *Id.*

### 2. Implied Warranty of Good Workmanship

In its summary judgment motion, Anglia Homes asserted that the mold disclaimer and the builders warranty sufficiently provided for the manner, performance, or quality of the desired construction to disclaim the implied warranty of good workmanship. On appeal, Mathewson disagrees that these documents were sufficient to disclaim the implied warranty.[6]

In our view, the mold disclaimer did not disclaim the implied warranty of good workmanship. This implied warranty is a gap-filler warranty that applies unless

---

[6] Mathewson also argues that the mold disclaimer and the builders warranty were not included or incorporated by reference in the purchase agreement, which is "the only document governing [Anglia Homes'] construction of the home." As discussed below, we agree with Mathewson that Anglia Homes did not meet its burden to establish that the mold disclaimer and the builders warranty sufficiently disclaimed the implied warranties. We therefore do not reach Mathewson's additional argument concerning the purchase agreement. *See id.*

the parties express a contrary intention. *Id.* at 273. The implied warranty can be disclaimed only when the parties' agreement provides for the manner, performance, or quality of the desired construction. *See id.* at 274–75. The mold disclaimer does not meet this standard; rather, it simply attempts to disclaim the implied warranty, which is insufficient. *See id*. Thus, we agree with Mathewson that the mold disclaimer alone is insufficient to disclaim the implied warranty of good workmanship.

We also agree with Mathewson that Anglia Homes did not conclusively establish that the builders warranty superseded the implied warranty of good workmanship. *See id.* Anglia Homes' summary judgment motion attached the nearly forty-page builders warranty document and argued that the builders warranty "expressly state[s] the construction standards for the home and that mold, mildew and fungus are not covered." But Anglia Homes relied on the entire document generally instead of pointing to any specific part of it that supported its argument.

Our review of the builders warranty reveals that it provided construction performance standards applicable to various components of the home construction, as Anglia Homes contends. But as to mold, the builders warranty provides only the following information:

- Performance Standard – "Mold, mildew or fungus can form as a result of leaks or condensation. This is considered consequential damage."
- Builders Responsibility – "None[.]"

- Mathewson's Responsibility – "Mold, mildew or fungus control is Your responsibility."[7]

Rather than describing the manner, performance, or quality of the desired construction concerning mold or its causes, this sparse reference attempts to simply disclaim responsibility for mold, which is insufficient. *See id.* Thus, the summary judgment evidence establishes that this is a circumstance in which the implied warranty fills the gap as a default warranty. *See id.* at 273.

The builders warranty here is distinguishable from the warranty in *Gonzales v. Southwest Olshan Foundation Repair Co.*, a foundation repair case which illustrates an express warranty that sufficiently disclaimed the implied warranty of good workmanship. *See* 400 S.W.3d 52 (Tex. 2013). Gonzales sued Olshan for breach of the implied warranty of good workmanship after Olshan allegedly repaired her foundation inadequately. *Id.* at 53–54. A warranty certificate and the parties' contract required Olshan to repair the foundation with a Cable Lock system, to perform the work in a good and workmanlike manner, and to adjust any settling in the foundation for life:

> This warranty language specified the work Olshan was to provide (foundation repair with the Cable Lock system), the manner in which it was to provide it (a good and workmanlike manner), and how the

---

[7] After assigning responsibility for mold, mildew, or fungus to Mathewson, the builders warranty refers to a "Homeowner Maintenance Manual available from BBWG." Anglia Homes did not rely on this manual in seeking summary judgment.

service would perform (that it would not need adjustments for life due to settling, or, if it did, would be adjusted without cost to the owner).

*Id.* The supreme court held that this language adequately superseded the implied warranty of good workmanship because it sufficiently described the manner, performance, or quality of how the company and foundation were to perform. *Id.* Anglia Homes has not directed this Court to any similar language concerning mold in the builders warranty.

### 3. Implied Warranty of Habitability

Anglia Homes also relied on the mold disclaimer and the builders warranty generally in moving for summary judgment on the claim for breach of the implied warranty of habitability. Anglia Homes also asserted that Mathewson "continue[s] to reside in the home." On appeal, Mathewson argues that this evidence does not establish that Anglia Homes disclaimed the implied warranty of habitability.

As an initial matter, Anglia Homes did not support its assertion that Mathewson "continue[s] to reside in the home." Although Mathewson's petition listed the home's address as his address, Anglia Homes has not pointed to any record evidence showing that he or anyone else lives in the house after discovering mold there. *See* TEX. R. CIV. P. 166a(c). Nor did Anglia Homes rely on any legal authority supporting its contention that a homeowner cannot continue living in a house to raise a claim for breach of the implied warranty of habitability concerning the home. Indulging every reasonable inference and resolving any doubts in favor of

27

Mathewson, we must conclude for summary judgment purposes that Mathewson is not living in the house. *See Wolford*, 263 S.W.3d at 15–16.

Moreover, neither the mold disclaimer nor the builders warranty discloses any defects concerning mold. *See Centex Homes*, 95 S.W.3d at 274. As discussed above, the builders warranty stated that mold "*can form* as a result of leaks or condensation." (Emphasis added.) The mold disclaimer similarly stated that "the continued presence of moisture within a home . . . *can cause* the propagation of molds, fungus or mildew that *may cause* allergenic reactions and other health problems in some individuals." (Emphasis added.) Neither of these references to mold discloses any defect, such as "when a purchaser buys a problem house with express and full knowledge of the defects that affect its habitability." *See id.* Instead, the mold disclaimer and builders warranty attempt to simply disclaim all implied warranties. This evidence does not establish that Anglia Homes sufficiently disclaimed the implied warranty of habitability, which is an essential part of a new home sale. *See id.*

### 4. *Taylor Morrison* and *Lennar Homes*

Finally, Anglia Homes argues that its position concerning both implied warranties is supported by two recent supreme court decisions concerning mold claims. *See Taylor Morrison of Tex., Inc. v. Kohlmeyer*, 672 S.W.3d 422, 426 (Tex.

2023) (per curiam); *Lennar Homes*, 672 S.W.3d at 377–79. These cases do not alter our analysis.

First, although *Taylor Morrison* and *Lennar Homes* touched on the implied warranties of habitability and good workmanship, both cases primarily concerned arbitrability of these issues. *Taylor Morrison*, 672 S.W.3d at 426 (holding that subsequent purchaser was bound by arbitration clause in original purchase agreement—which contained disclosures that could affect implied warranties of habitability and good workmanship); *Lennar Homes*, 672 S.W.3d at 379–80 (same). In addressing the implied warranties, *Lennar Homes* relied on *Centex Homes*, and *Taylor Morrison* relied on *Lennar Homes* because the two cases addressed similar issues. But neither case modified or even applied the law in *Centex Homes* because the implied warranty claims were arbitrable. *See Taylor Morrison*, 672 S.W.3d at 426; *Lennar Homes*, 672 S.W.3d at 379–80.

Second, Anglia Homes primarily relies on the statement in *Lennar Homes* that "liability arises in part from the general law," but "*nonliability* arises from the terms of the express warranties" in that case. *See* 672 S.W.3d at 379. The court made this statement, however, in rejecting the plaintiff's contention that the implied warranty of good workmanship is independent of the purchase sale agreement. *Id.* at 377–79. The court explained that liability for breach of the implied warranties is not independent of the contractual undertaking, but it did not otherwise change the law

set forth in *Centex Homes*. *Id.* Thus, the statement on which Anglia Homes relies does not support its position.

To the extent *Taylor Morrison* and *Lennar Homes* addressed the merits of the implied warranty claims, they support our analysis. In this respect, *Taylor Morrison* stated only that "in addition to general and specific disclaimers, the original purchase agreement contained disclosures that could affect the implied warranty of habitability and performance standards that could affect the implied warranty of good workmanship." 672 S.W.3d at 426. The same is true here: the builders warranty contains disclosures and performance standards that could affect the implied warranties of habitability and good workmanship. But as discussed above, Anglia Homes did not meet its summary judgment burden to conclusively establish it did so.

Similarly, *Lennar Homes* stated that whether a warranty, general disclaimer of the warranty of habitability, and disclosures in the purchase agreement "were sufficient to negate any implied warranty of habitability with respect to mold growth will depend on the particulars of Lennar's express disclosures." 672 S.W.3d at 379. The court concluded that the builder's liability for breach of the implied warranty of habitability does not arise solely from the agreement, but the implied warranty is not independent of the agreement and must be determined by reference to it. *Id.* The

same holds true in this case, but Anglia Homes did not meet its summary judgment burden to establish that it adequately negated the implied warranties.

In sum, we conclude that Anglia Homes did not establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law on Mathewson's claims for breach of the implied warranties of habitability and good workmanship. *See Wolford*, 263 S.W.3d at 15–16. Thus, we hold that the trial court erred by granting summary judgment on these claims.

We sustain Mathewson's second issue.

## Conclusion

We reverse the summary judgment on Mathewson's causes of action for breach of contract and breach of the implied warranties of habitability and good workmanship, and we remand these causes of action for further proceedings. We affirm the remainder of the summary judgment.

David Gunn
Justice

Panel consists of Justices Guerra, Gunn, and Dokupil.